UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
LIBERTY GLOBAL LOGISTICS LLC,

                Plaintiff,

   -against-

BOMIN BUNKER OIL CORP.,

                Defendant.
----------------------------------------------------------x

19 Civ. 3842 (PAE)(SN)

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Individual Rules and Order, dated June 28, 2021, Plaintiff, Liberty Global Logistics LLC[1], by their attorneys, Cardillo & Corbett and Hill, Betts & Nash, LLP., submit the following Proposed Findings of Fact and Conclusion of Law in support of its position that Defendant, Bomin Bunker Oil Corp. ("Defendant" or "Bomin"), breached an oral contract with Plaintiff by negligently supplying the M/V LIBERTY PEACE ("Vessel"), with off specification Heavy Fuel Oil on March 8, 2018, in Beaumont, Texas, resulting in catastrophic damage to the Vessel when it lost power and propulsion on May 12, 2018, near Suez, Egypt, while on transport for the Military Sealift Command; and that Plaintiff is entitled to an award of such damages as the evidence shows, but presently calculated in the sum of $1,422,765.52, with interest and costs.

## FINDINGS OF FACT

   a. **Parties**

1. Plaintiff Liberty Global Logistics LLC is a company organized and existing under the laws of Delaware.

2. Plaintiff was and is, at all relevant times in this action, the charterer of the Vessel under a bareboat charter party dated August 14, 2017, between Wilmington Trust Company as

---

[1] Liberty Global Logistics LLC ("LGL" or "Plaintiff") and Liberty Maritime Corporation ("LMC" or "Managers"), are at times each and/or collectively referred to as "Liberty."

{NY239838.1 }

owner trustee and Liberty as bareboat charterer (the "Bareboat Charter") [Plaintiff's Exh. 1].

3. Defendant Bomin Bunker Oil Corp. is a corporation organized and existing under the laws of Texas.

   **b. Negotiations**

4. Pursuant to the Vessel Operating and Management Agreements dated September 1, 2009 and June 30, 2018 (the "VOMAs") [Plaintiff's Exh. 2], Plaintiff appointed LMC to manage and operate the Vessel.

5. LMC has an office and place of business at 1979 Marcus Avenue, Suite 200, Lake Success, NY 11042.

6. Under the terms of the VOMAs, LMC was appointed by LGL to carry out several functions, including arranging for the supply of necessary fuel to operate the Vessel.

7. At all relevant times in this action, Efthimios Vassilas ("Vassilas") was and is employed as the Operations Manager of LMC in its office at Lake Success [Vassilas Affdvt. ¶ 4].

8. At all relevant times in this action. Aaron Garza ("Garza") was employed as a bunker broker at Integr8 Fuels Americas LLC ("Integr8") at its office in 5718 Westheimer Road, Suite 1810, Houston, Texas.

9. At all relevant times in this action, Mike Parrent ("Parrent") was and is the Marketing Manager for Bomin at its office in Houston, Texas [Parrent Dep. 10:14-17].

10. On February 28, 2018, at 10:38 am (EST), Vassilas sent an email to Garza requesting Garza to obtain firm offers from suppliers to supply the Vessel at Beaumont, Texas [Plaintiff's Exh. 3; ]. Mr. Vassilas' email set forth the estimated time of the Vessel's arrival at Beaumont, the grade of fuel required, the quality and quantity required as follows:

    Subject: Liberty Peace 006 – Bunkers – Beaumont

    Please obtain firm brokered pricing for the following:

    1. 1,300 mt +/- 10% HFO RMG 380 – Sulphur max 3.50%
    2. 300 mt LSMGO – Sulphur max 0.10%

    ETA Beaumont Mar 08th

    FYI, we are reaching out direct to Peninsula for quotes.
    Please advise the suppliers you are quoting.

11. On February 28, 2018, at 10:39 am (EST), Garza sent an email to undisclosed recipients, including among them Parrent, in which Garza quoted the requirements that Vassilas had set forth in Plaintiff's Exhibit and requested Parrent to submit an offer for the business described by Vassilas [Plaintiff's Exh. 22; ]. Garza's email stated as follows:

    Subject: FW Liberty Peace 006 – Bunkers – Beaumont

    Hey All,

    Pls quote for Liverty [sic] Maritime

    Best regards,

    Aaron Garza
    Bunker Trader

    Please obtain firm brokered pricing for the following:

    1. 1,300 mt +/- 10% HFO RMG 380 – Sulphur max 3.50%
    2. 300 mt LSMGO – Sulphur max 0.10%

    ETA Beaumont Mar 08th

    FYI, we are reaching out direct to Peninsula for quotes.
    Please advise the suppliers you are quoting.

12. On February 28, 2018, at 10:54 a.m. EST, Parrent, on behalf of Bomin, replied by email to Plaintiff's Exhibit by quoting a price at which Bomin was willing to supply the fuel required by Vassilas for the Vessel [Plaintiff's Exh. 22]. The email by Parrent to Garza stated the following:

    $351/582 MTW

    All others were no quoted

13. By his reply in Plaintiff's Exhibit 22, Parrent meant that Bomin was willing to meet the Vessel's requirements with respect to the quantities, grades, port, and date set forth by Vassilas in Plaintiff's Exhibit 3 and supply the Vessel with HFO, or Heavy Fuel Oil, at a price of $351 per metric ton and MGO, or Marine Gas Oil, at a price of $582 per metric ton, plus standard applicable barging.

14. By stating "All others were no quoted", Parrent meant that since Garza was the first broker to have communicated Liberty's fuel requirements to Bomin, that Bomin would make all offers exclusively through Garza. Plaintiff's Exhibit 22.

15. On February 28, 2010, at 11:33 am (EST), Garza sent an email to Vassilas [Plaintiff's Exh. 3] in which he passed on a lower offer made by a different supplier, Vitol, as follows:

    We can offer below with Vitol. I can probably get Bomin down to compete as well if you prefer them so pls let me know!

    $348//$581 mtw
    BARGING:
    $12.45/MT ($13,370 Min) Barging
    + 24% Fuel Surcharge
    + $10.50 Security Fee
    + $64 Harbor Fee

16. On February 28, 2018, at 11:41 am (EST), Vassilas sent an email to Garza indicating that he would postpone negotiations until the next day due to a change in the marine fuel market [Plaintiff's Exh. 3]. Vassilas' email stated in relevant part as follows:

    Lets [sic] revisit tomorrow basis change in market

17. The next morning on March 1, 2018, at 8:37 am (EST) Garza advised Parrent that Liberty would revisit the negotiation around 11 am on March 1 [Plaintiff's Exh. 25]. Garza's email to Parrent provided as follows in relevant part:

    Hey Mike,

    Owners advising they will revisit this around 11 AM today. Will be back when they want us to go out firm.

18. On March 1, 2018, 1t 11:35 am (EST), Vassilas asked Garza to submit firm price quotes for the same fuel requirements described on February 28 [Plaintiff's Exh. 3]:

    Please quote firm as per initial msg below.

19. On March 1, 2018, at 11:36 am (EST), Garza asked Parrent to submit firm price quotes for Liberty's fuel requirements [Plaintiff's Exh. 27]:

    Lets [sic] quote again pls. Liberty asking for firm quotes now.

20. On March 1, 2018, at 11:42 am (EST), Parrent submitted firm quotes as follows [Plaintiff's Exh. 29]:

    $337 /570 MTW

    Thats [sic] Inc 1 for you

21. By his reply in Plaintiff's Exhibit 29, Parrent meant that Bomin was willing to meet the Vessel's requirements with respect to the quantities, grades, port, and date set forth by Vassilas in Exhibit 3 and supply the Vessel with HFO, or Heavy Fuel Oil, at a price of $337 per metric ton and MGO, or Marine Gas Oil, at a price of $570 per metric ton, plus standard applicable barging.

22. By stating "Thats Inc 1 for you", Parrent meant that the price quoted included a $1 brokerage commission payable by Bomin to Integr8.

23. By email dated March 1, 2018, at 12:13 pm (EST), Garza passed on Bomin's firm offer, stating as follows [Plaintiff's Exh. 30]:

    I can quote the below basis Bomin. Pls let me know how I look.
    $337//570 mtw

    $12.45/MT ($13,370 Min) Barging
    + 24% Fuel Surcharge
    + $10.50 Security Fee
    + $64 Harbor Fee

24. By email dated March 1, 2018, at 12:18 pm EST), from Garza to Vassilas, Garza submitted an amended offer by Bomin, explaining that the "market had popped" [Plaintiff's Exh. 31]:

    Bomin said market had popped and needs to amend price to below.
    $340//573 mtw

    $12.45/MT ($13,370 Min) Barging
    + 24% Fuel Surcharge
    + $10.50 Security Fee
    + $64 Harbor Fee

25. Vassilas sent Garza an email at the same time, March 1, 2018, at 12:18 pm, asking Garza to submit a counteroffer to Bomin for the MGO at $565 [Plaintiff's Exh. 4 and 32]:

    Counter the MGO at 565.

26. By email dated March 1, 2018, at 12:23 pm, Garza confirmed an oral agreement with Vassilas whereby Liberty accepted Bomin's offer to supply the Vessel at the following prices [Plaintiff's Exh. 3 and 33]:

    As per telcom, confirmed at $338//$571 mtw + Barging

27. By email dated March 1, 2018, at 12:24 pm [Plaintiff's Exh. 34]. Garza confirmed to Parent that Liberty had agreed to accept Bomin's offer to supply the Vessel at Beaumont on or about March 8, 2018, at the prices offered by Bomin, in the range of quantities and the grades of fuel oil specified in Vassilas' initial email of February 28, 2018 [Plaintiff's Exh. 3]:

    Confirmed at $338//$571 mtw inc $1

    Formals to follow.

28. At no time during the negotiations, were any limits on the time to assert a claim or limits on the damages recoverable by Liberty discussed between Vassilas and Garza [Garza Dep. 48:5-49:1].

**c. Communications Exchanged After the Negotiations Had Concluded**

29. In an email dated March 1, 2018, at 12:43 pm (EST), Vassilas replied to Garza's email confirming the making of the supply contract and thanked Garza for concluding the agreement [Plaintiff's Exh. 5]:

    Thx Aaron!

    Get well soon.

30. After the conclusion of the negotiations, LMC's purchasing department sent its purchase order to Garza confirming the terms agreed to between Bomin and Liberty [Plaintiff's Exh. 6 and 7]. The purchase order did not seek to alter or amend the terms of the agreement.

31. On March 1, 2018, at 1:17 pm (EST) Michael Flatley of Integr8 sent an email purporting to confirm the supply agreement. The email contained an incorrect quantity range for the HFO, depicting the range as "1,300 MT – 1,300 MT", instead of 1,170 mt – 1,430 mt, as had been agreed between the parties [Plaintiff's Exh. 8].

32. On March 1, 2018, at 2:00 p.m. (EST), Garza sent an amended bunker confirmation purporting to correct Mr. Flatley's error. The message, however, contained another clerical error in the HFO quantity range, incorrectly providing a quantity range of 1,130 MT - 1,430 MT, instead of 1,170 MT – 1,430 MT [Plaintiff's Exh. 9].

### d. The Delivery of the Fuel to the Vessel by Bomin at Beaumont

33. On March 8, 2018, Bomin delivered 1,302.54 metric tons of HFO RMG 380, along with 300.10 metric tons of MGO and issued a Bunker Delivery Note or Receipt ("BDN") which contained the name of the vessel, port, data of the supplier and the quantity and characteristics of the fuel oil [Plaintiff's Exh. 86].

### e. Initial Testing of the Bomin Fuel

34. In accordance with its usual, practice, the Vessel's manager, arranged for samples of the Bomin Fuel to be taken and tested. The test results are examined by the manager's engineering department and the crew prior to the Vessel's consuming the fuel. The samples were tested by Viswa Lab ("Viswa") with whom the manager has an arrangement to sample and test the fuel [Makrinos Declaration ¶ 7].

35. The tests conducted by Viswa were normal tests to determine whether the marine fuel of the grade supplied by Bomin to the Vessel meets the basic specifications set forth in Table 2 of ISO 8217:2010. Those test methods are the only ones normally conducted, unless there is a reason to suspect that the fuel is defective. The normal test methods do not yield any information on the presence of unusual substances that may render the fuel harmful to the vessel's machinery [Makrinos Declaration ¶ 10; Fisher Declaration ¶ 39].

36. The results were reported via email dated March 20, 2018, sent by Viswa to the manager's engineering department and to Mr. Theodore S. Makrinos, Vice-President of Engineering of the Vessel's manager, who oversees the engineering department [Plaintiff's Ex. 11, Joint Ex. 5; Makrinos Declaration ¶¶ 1, 7-8].

37. The tests conducted by Viswa revealed that the fuel slightly exceeded the maximum specification for density. The Vessel has high-density purifiers, however, that can safely treat the fuel having the density reported by Viswa [Makrinos Declaration ¶ 9].

### f. The Fuel Components of the Auxiliary Engines Were Damaged Immediately After Consuming the Bomin Fuel

38. On May 12, 2018, two of the Vessel's generators or auxiliary engines shut down causing the Vessel to lose electrical power and causing the main engine to shut down while the Vessel was at sea on its way north to the Suez Canal. The No. 3 generator had failed a few days before and attempts to restart it failed. Having lost electrical power and propulsion. The Vessel had to be towed to Port Suez [Plaintiff's Ex. 88-89, 135-138, 142; Joint Ex. 68; 72-74, 79; Makrinos Declaration ¶¶ 13-14].

39. The Chief Engineer of the Vessel reported that the Vessel began consuming the Bomin Fuel on April 24, 2018. Immediately thereafter the frequency of self-cleaning cycles or "shoots" of the fuel filters of the main and auxiliary engines increased, which was an indication that the fuel filters were becoming blocked. The Chief Engineer also reported that there was sticking of the fuel pump racks which resulted in the failure of the three

generators [Plaintiff's Ex. 88-89, 135-138, 142; Joint Ex. 68; 72-74, 79; Makrinos Declaration ¶ 13; Fisher Declaration ¶ ¶ 29-32].

### g. Inspection and Repairs at Port Suez Point to the Bomin Fuel as the Cause of the Casualty.

40. Upon learning of the casualty, Mr. Makrinos arranged for the engine manufacturers of the Vessel's main and auxiliary engines to attend the Vessel in Port Suez, inspect the engines, and undertake the necessary repairs to allow the Vessel to resume its voyage [Makrinos Declaration ¶ 15].

41. Since the facts pointed to the Bomin Fuel being the cause of the casualty, arrangements were made to have Viswa take samples of the fuel and conduct enhanced testing to determine whether the fuel was contaminated with substances that had caused the damage to the fuel components [Makrinos Declaration ¶ 15].

42. After inspecting the generators and renewing or reconditioning the damaged parts, the technician for the manufacturer, Hyundai Global Service, concluded that the Bomin Fuel had damaged the fuel injection equipment causing the generators to shut down. [Plaintiff's Ex 139, p. 2; Joint Ex. 76].

43. The technician for the engine manufacturer, MAN Energy Solutions Middle East LLC, found the fuel injection valves to be in poor/fouled condition and replaced them with spares. He reported that the effect of the contaminated fuel on the engine components was not clearly identifiable at the time and made a few recommendations including further inspection and testing [Plaintiff's Ex 132, p. 2; Joint Ex. 70].

### h. Viswa Confirms that the Bomin Fuel was Contaminated with Substances Harmful to the Engines' Fuel Components

44. Viswa conducted enhanced testing of samples of the Bomin Fuel taken both at the time the Vessel was bunkered and samples taken in Port Suez, using the techniques of Fourier-Transform Infrared Spectroscopy (FTIR) and Gas Chromatography - Mass Spectrometry (GC-MS to investigate whether the fuel contained unusual substances that could harm the engines. Viswa reported that the fuel was contaminated with substances typical of chemical waste, the nature of which are known to cause sticking and damage to fuel, including phenol, acetophenone, and fatty acid methyl esters or FAME [Plaintiff's Ex. 110-116, 135; Fisher Declaration ¶¶ 39-42].

### i. Testing of the Retained Barge Originally Provided Samples Provided by Bomin when the Vessel was Bunkered Showed that the Bomin Fuel was Contaminated with Substances not Normally Associated with the Production of Marine Fuels

45. The parties agreed to test two of the barge samples that were provided by Bomin at the time the Vessel was bunkered. The samples were tested at the Intertek labs in England in December 2019. Testing was conducted in two phases with basic analysis (ISO 8217 table 2 tests) being carried out at lntertek, Thurrock and enhanced testing using the FTIR and

GC-MS techniques at Intertek, Sunbury [Plaintiff's Ex. 150-151; Joint Ex. 82; Fisher Declaration ¶¶ 46-50]. With respect to the basic test, the two samples exhibited high density and higher than normal acid numbers. With respect to the enhanced testing, the samples revealed the presence of substances not normally associated and not permitted in with marine fuels as follows:

> Bio-derived compounds: Fatty acids; palmitic acid (C16:0), stearic acid (C18:0) and two other "C18" unsaturated (olefinic) fatty acids; possible C12 and C14 fatty acids; dehydroabietic acid (a rosin acid); abietic acid (a rosin acid), Other rosin acid compounds, C16 monoglyceride.

> Other chemical compounds: cyclohexanediol isomer, Bisphenol F and associated isomers,1,4 benzene-1.4-diol (hydroquinone). There was also evidence for the presence of 'acrylate' compounds.

### j. Bomin's Waiver of Time Bar and General Terms & Conditions of Sale for Debunkering the Vessel

46. On May 16, 2018, Vassilas gave notice via Garza of Liberty's claim against Bomin for defective bunkers. Plaintiff's Exh. 10, pg. 2.

47. On May 17, 2018, Bomin responded that "Bomin's claim period is 14 days from the date of delivery" and that as such, "this claim is time barred." Plaintiff's Exh. 13.

48. On or about June 14, 2018, Bomin agreed to buy the remaining contaminated fuel on board the Vessel at the same price per metric ton at which it had been sold to Liberty, making Liberty whole with respect to that quantity of fuel but leaving Liberty otherwise uncompensated for losses and expenses resulting from the contaminated fuel. Plaintiff's Exhs. 17-19.

49. Bomin's purchase of the remaining fuel, in compensating and making Liberty whole with respect to that quantity, waived any claim of time bar under Bomin's general terms or otherwise.

### k. Three Other Vessels Which Were Supplied with Bunkers by Bomin in March 2018 that were Delivered by the Same Barge and that Were Sourced from the Same Shore Tank as the HFO Supplied to the Vessel in March 2018 Asserted Claims Against Bomin for Engine Problems Caused by the Bunkers

50. In March 2018, Bomin employed Barge MGI 2332 to supply HFO sourced from Tank 100-3 to various vessels, including the Vessel [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions Nos. 10-11, 13-14, 15-23, 25-27].

51. Tank 100-3, located at the Pelican Island Storage Terminal in Galveston, Texas, was under lease to or for the benefit of Bomin in 2018 ("Tank 100-3") [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 12].

52. By agreement dated February 27, 2018, Bomin purchased 45,000 barrels, plus or minus 10% in seller's option of RMG 380 from Motiva Enterprises LLC ("Motiva") ("Motiva Agreement 1") [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 43].

53. On March 5, 2018, Motiva delivered 45,258.02 barrels of RMG 380 to Bomin pursuant to Motiva Agreement 1[Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 44].

54. All 45,258.02 barrels of RMG 380 delivered by Motiva to Bomin on March 5, 2018, were transferred into Tank 100-3 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 45].

55. By agreement dated March 2, 2018, Bomin purchased 42,000 barrels, plus or minus 5% in seller's option of RMG 380 from Motiva ("Motiva Agreement 2") [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 48].

56. On March 6, 2018, Motiva delivered 42,421.17 barrels of RMG 380 to Bomin pursuant to Motiva Agreement 2 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 49].

57. Tank 25-11, located at the Pelican Island Storage Terminal in Galveston, Texas, was under lease to or for the benefit of Bomin in 2018 ("Tank 25-11") [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 50].

58. Of the 42,421.17 barrels of RMG 380 delivered by Motiva to Bomin on March 6, 2018, 16,337.05 barrels were transferred into Tank 25-11 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 51].

59. On March 5, 2018, 15,242.88 barrels of RMG 380 were transferred from Tank 100-3 to Barge MGI 2332 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 52].

60. On March 6, 2018, Bomin bunkered the M/V Toronto with 10,183.72 barrels, or 1,602.10 metric tons, of Heavy Fuel Oil, RMG 380 (the "Toronto HFO") [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 10].

61. On March 6, 2018, the M/V Toronto was bunkered by the Barge MGI 2332 with the Toronto HFO [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 11].

62. The Toronto HFO was sourced from Tank 100-3 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 14].

63. On March 7, 2018, 16,956.47 barrels of RMG 380 were transferred from Tank 25-11 to Tank 100-3 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 52].

64. On March 7, 2018, 10,066.30 barrels of RMG 380 were transferred from Tank 100-3 to Barge MGI 2332 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 17 .

65. On March 8, 2018, Bomin bunkered the Vessel with 8,279.56 barrels, or 1,302.54 metric tons, of Heavy Fuel Oil, RMG 380 (the "Liberty Peace HFO") [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 15].

66. The Vessel was bunkered by Barge MGI 2332 with the Liberty Peace HFO [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 16].

67. The Liberty Peace HFO was sourced from Tank 100-3 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 18].

68. On March 8 and 9, 2018, Bomin bunkered the M/V Eagle Sydney with 3,175.71 barrels, or 499.60 metric tons, of Heavy Fuel Oil, RMG 380 (the "Eagle Sydney HFO") [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 19].

69. The M/V Eagle Sydney was bunkered by the Barge MGI 2332 with the Eagle Sydney HFO [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 20].

70. The Eagle Sydney HFO was sourced from Tank 100-3 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 21].

71. On March 7, 2018, 12,237.29 barrels of RMG 380 were transferred from Tank 100-3 to Barge MGI 2331[Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 23].

72. On March 9, 2018, Bomin bunkered the M/V Advantage Arrow with 8,496.95 barrels, or 1,336.74 metric tons, of Heavy Fuel Oil, RMG 380 (the "Advantage Arrow HFO-1") [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 22].

73. The M/V Advantage Arrow was bunkered by the Barge MGI 2331 with the Advantage Arrow HFO-1 [Plaintiff's Exh. 80; Joint Ex. 61].

74. On March 10, 2018, Bomin bunkered the M/V Advantage Arrow with 1,904.60 barrels, or 299.64 metric tons, of Heavy Fuel Oil, RMG 380 (the "Advantage Arrow HFO-2"). [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 25]

75. The M/V Advantage Arrow was bunkered by the Barge MGI 2332 with the Advantage Arrow HFO-2 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 26].

76. The Advantage Arrow HFO-1 and the Advantage Arrow HFO-2 were sourced from Tank 100-3 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 27].

77. At least as early as March 13, 2018, Bomin had received complaints from the owners and/or operators of the M/V Toronto that the Toronto HFO had caused engine problems, including a main engine breakdown of said vessel in Panama [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 28].

78. On or about May 22, 2018, the owners and/or operators of the M/V Eagle Sydney put Bomin on notice for fuel quality issues relating to chemical contaminants in connection with the Eagle Sydney HFO [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 29].

79. Sometime between March 2018 and July 2018, Bomin received a claim and/or complaint from the owners and/or operators of the M/V Advantage Arrow concerning the quality of the Advantage Arrow HFO-1 and HFO-2 [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 30].

80. After receiving a claim from the owners and/or operators of the M/V Toronto, Bomin agreed to de-bunker the vessel and buy back the Toronto HFO that remained on board [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 31].

81. The M/V Toronto was de-bunkered on May 15, 2018, and Bomin repurchased 8,675 barrels of HFO for the same price for which it was supplied [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 32].

82. After receiving a claim from the owners and/or operators of the M/V Eagle Sydney, Bomin agreed to de-bunker the M/V Eagle Sydney HFO on July 16-17, 2018, and Bomin repurchased 367.990 MTS of HFO for the same price for which it was supplied [Admitted by Bomin in Answer to Plaintiff's Second Request Set of Requests for Admissions No. 33].

### l. Bomin Issued a Formal Claim to its Supplier, Motiva, for Off-Specification Product Sold by Motiva to Bomin in early March 2018, Because It Was a Supplier for the Batch of Fuel Oil that Went out to the Vessel and the Three Other Ships

83. Bomin issued a formal claim to Motiva for off-spec fuel by email dated May 31, 2018 [Plaintiff's Ex. 74; Joint Ex. 56] as follows:

    Subject: Notice of claim: Off-spec fuel March 5, 2018

    I am writing to issue a formal claim to Motiva for off-specification product that was transferred into Bomin's inventory on March 5, 2018. Bomin has received 4 claims for product quality which has resulted in total engine failure. Bomin purchased this product through Alpha Energy (Adam Robinson) on March 2, 2018. The recap states the specification shall meet Platt's HSFO Guarantees.

    Per Platt's Methodology, all USGC HSFO assessment, "This assessment reflects RMG 380 fuel oil in line with the ISO 8217: 2005 standard for petroleum products - Fuels (Class F) - Specifications of Marine Fuels, but with a maximum sulfur limit of 3.5%"

    Per ISO 8717 2005, clause 5.2 "The fuel should not include any added substance or chemical waste which a) jeopardizes the safety of ships or adversly [sic] affects the performance of the machinery [sic]; or b) is harmful to personnel;"

    We further reserve the right to claim additional damages with deliveries made from this batch of fuel oil.

84. The email was sent by Chris Nelson ("Nelson"), who at the time was Bomin's Vice-President of Supply and Operations and who is now the President and CEO of Bomin [Nelson Dep. 9:8-13].

85. The four claims referred to by Bomin in the Notice of Claim were those made by the owners or operators of the M/V Toronto, M/V Eagle Sydney, the M/V Advantage Arrow, and the Vessel [Nelson Dep. 10:18-11:4].

86. Motiva was put on notice by Bomin, because it was a supplier for the batch of oil that went out to the four ships [Nelson Dep. 13:4-6].

87. Nelson followed up with a second Notice of Claim also sent by email on July 8, 2018 [Plaintiff's Ex. 82' Joint Ex. 63] as follows:

    Subject: Re: Notice of claim: Off-spec fuel March 5, 2018

    I am writing with respect to the supply contract no. 18-1313-6-B entered into on 27 February 2018 and our previous correspondence, in particular our e-mail dated 31 May 2018.

Unfortunately, Motiva has not responded to our initial claim and we are seeking additional information.

As requested, we urge you to confirm that samples taken upon delivery have been preserved, to send us the respective details of such samples (nos. etc.) via e-mail and to dispatch the respective samples to the independent lab Amspec in Houston which will be instructed to keep them until further notice for joint testing or similar action.

Further, we urge you to send us the test protocols/lab analyses done at delivery so that we can counter check theses protocols for the substances in question. As previously informed, we have received various claims regarding off spec product, some resulting in engine problems and failure.

Further, please advise as to the full chain of custody, vis-a-vis the names of the suppliers, of the fuel in question back to the refinery.

Lastly, please inform your local liability insurer and provide us with the claim number and your insurer's contact details.

Bomin's rights and remedies remain reserved in full.

**m. Other Vessels That Issued a Notice of Quality Claim to Bomin in 2018**

88. Bomin also received numerous complaints from other vessel owners concerning the harmful and/or deficient quality of bunkers that Bomin supplied to their vessels. As far as known, in total, Bomin received notices and/or complaints regarding the following vessels, in early 2018: [See Plaintiff's Exh. 210; 217; 231]

- M/V Bomar Resolute [Plaintiff's Exh. 229];
- M/V Bomar Resolute Quality [Plaintiff's Exh. 228];
- M/V Aspen Spirit [Plaintiff's Exh. 226 and 227];
- M/T Grimstad – M/T Karavas [Plaintiff's Exh. 224 and 225];
- M/T Seasprite [Plaintiff's Exh. 223];
- M/V Navigator Pegasus [Plaintiff's Exh. 222];
- M/V Team Tosca [Plaintiff's Exh. 218; 219; 220; and 221];
- M/V Endeavour [Plaintiff's Exh. 213; 214; 215; and 216];
- M/V Ghibli [Plaintiff's Exh. 211 and 212];
- M/V Philline Schultz [Plaintiff's Exh. 209];
- M/V Toronto [Plaintiff's Exh. 62 and 70]; and
- M/V Eagle Sydney [Plaintiff's Exh. 62 and 68].
- M/V Liberty Peace [Plaintiff's Exh. 10, p, 2]

# CONCLUSIONS OF LAW

1. Contracts for the sale of fuel to vessels are maritime in nature, and therefore, are governed by the general maritime law of the United States. *See, e.g., Can. S.S. Lines, Inc. v. Warner Petroleum Corp.*, 2009 U.S. Dist. LEXIS 94991 *7 (N.D. Ind. 2009); *Great Am. Lines v. Global Petroleum Corp.*, 1997 U.S. Dist. LEXIS 24472 *10 (D.N.J. 1997).

2. Under maritime law, oral contracts are enforceable. *Kossick. v. United Fruit Company*, 365 U.S. 731, 81 S.Ct 886, 6 L.Ed. 2d 56 (1961); *Great Am. Lines v. Global Petroleum Corp.*, 1997 U.S. Dist. LEXIS 24472 (D.N.J. 1997).

3. Bomin and Liberty reached an enforceable oral contract, because just prior to 12:23 p..m. on March 1, 2018, they had agreed on all essential terms, that is, price, quantity, quality, date and place of delivery of the fuel. *Great Am*

4. The Uniform Commercial Code informs federal maritime law, and therefore, governs maritime sales contracts. *Warner Petroleum, at *7* ("the Uniform Commercial Code is the controlling law for federal admiralty law"); *Great Am. at *10* ("the U.C.C. is considered a source for federal admiralty law").

5. Pursuant to U.C.C. 2-213(1)(a), by agreeing to supply a specific grade of fuel oil, that is, HFO RMG 380, Bomin expressly warranted that the fuel would conform to the characteristics and specifications of that grade of fuel. Bomin breached that express warranty by supplying contaminated fuel that harmed the engines' fuel components..

6. Bomin's attempt to impose limits on the time within which a claim must be brought or limit the damages that Liberty may recover, or exclude implied warranties, by reference to its general terms and conditions fails. Under U.C.C. § 2-207, the contract did not incorporate Bomin's general terms and conditions, because they: The agreement reached between Garza and Vassilas on March 1, 2018, just prior to 12:23 p.m., covered all the essential terms required for a binding contract to purchase the fuel.

    (a) materially altered the contract; and

    (b) were not agreed to by Liberty, expressly or otherwise, and were not incorporated into the contract under U.C.C. § 2-207(2)(b); see also Official Comments 3 and 4 to this Section; *Great Am. Lines v. Global Petroleum Corp.*, 1997 U.S.Dist. LEXIS 24472 (D.N.J. 1997); *Tosco Corp. v. Oxygenated Mktg and Trading A.G.*, 1999 U.S. Dist. LEXIS 7903 at * 13 (S.D.N.Y. May 20, 1999) (citing U.C.C. § 2-207 cmt. 4); *St. Charles Cable Co. v. Eagle Comtronics, Inc.*, 687 F. Supp. 820, 827 (S.D.N.Y. 1988).

7. Clauses 8.1 and 8.2 of Bomin's general terms and conditions set forth time bar provisions barring claims after 14 and 30 days following the Vessel's receipt of bunkers on board, and such terms:

    (a) represent a material change in the previously agreed contract;

(b) would, if incorporated, cause surprise and hardship to Liberty;

(c) were not expressly agreed; and

(d) were not incorporated into the contract. U.C.C. § 2-207(2)(b); see also Official Comments 3 and 4 to this Section; *Great Am. Lines*, 1997 U.S.Dist. LEXIS 24472 (D.N.J. 1997); *Tosco Corp.*, 1999 U.S. Dist. LEXIS 7903 at * 13 (May 20, 1999) (citing U.C.C. § 2-207 cmt. 4); *St. Charles Cable Co. v. Eagle Comtronics, Inc.*, 687 F. Supp. at 827.

8. Clause 5.1 of Bomin's general terms and conditions excludes and nullifies warranties implied at law into the contract, and such terms:

(a) represent a material change in the previously agreed contract;

(b) would, if incorporated, cause surprise and hardship to Liberty;

(c) were not expressly agreed; and

(d) were not incorporated into the contract. U.C.C. § 2-207(2)(b); see also Official Comments 3 and 4 to this Section; *Great Am. Lines*, 1997 U.S.Dist. LEXIS 24472 (D.N.J. 1997); *Tosco Corp.*, 1999 U.S. Dist. LEXIS 7903 at * 13 (May 20, 1999) (citing U.C.C. § 2-207 cmt. 4); *St. Charles Cable Co. v. Eagle Comtronics, Inc.*, 687 F. Supp. at 827.

9. Clauses 5.7 and 14.1 of Bomin's general terms and conditions contain limitations on damages, and such terms:

(a) represent a material change in the previously agreed contract;

(b) would, if incorporated, cause surprise and hardship to Liberty;

(c) were not expressly agreed; and

(d) were not incorporated into the contract. U.C.C. § 2-207(2)(b); see also Official Comments 3 and 4 to this Section; *Great Am. Lines*, 1997 U.S.Dist. LEXIS 24472 (D.N.J. 1997); *Tosco Corp.*, 1999 U.S. Dist. LEXIS 7903 at * 13 (May 20, 1999) (citing U.C.C. § 2-207 cmt. 4); *St. Charles Cable Co. v. Eagle Comtronics, Inc.*, 687 F. Supp. at 827.

10. There is no custom or practice in the marine fuel industry whereby a supplier's terms become part of the purchase contract if not objected to by the buyer. See Plaintif's Exh. 43. *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010). (The custom and usage must be "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and they contracted in reference thereto.")

11. By agreeing to buy back the remaining contaminated fuel at the same price per metric ton as paid by Liberty, Bomin made Liberty whole with respect to that quantity and waived any time bar that might have been applicable under Bomin's general terms and conditions. *Great Am. Ins. Co. v. M/V Handy Laker*, 2002 U.S. Dist. LEXIS 26378, *25-28, 2003 AMC 116, aff'd, 348 F.3d 352 (2d Cir. 2003), citing *McNamara v. Tug "Diana L. Moran"*, No. 87 Civ. 3096, 1989 U.S. Dist. LEXIS 10634, at *18-19 (S.D.N.Y. Sept. 7, 1989).

12. Even if Defendant's general conditions for sale and delivery were incorporated into the parties' contract and were not waived, which Liberty disputes, this does not bar or limit Liberty's claim for damages or preclude a claim for breach of warranty.

13. The emails that attempt to incorporate the general conditions for sale and delivery represent that the bunker fuel to be supplied by Bomin possessed the specifications set forth in the ISO Standard, 8217:2010. See Plaintiff's Exhs. 73. Such affirmation constituted an express warranty under U.C.C. § 2-213 that the fuel would comply with the requirements set forth in the ISO Standard. Those requirements were not met by Bomin's fuel which contained contaminants that adversely affected the Vessel's machinery. Therefore, even if the general conditions for sale and delivery had been incorporated, Bomin would be in breach of warranty.

14. The very short time limits contained in the general conditions of 14 days and 30 days to assert a claim are unenforceable as wholly inadequate under the facts of this case pursuant to U.C.C. § 1-204. As discussed above, the contaminants present in the fuel were not discoverable by ordinary testing – enhanced testing was required which would not be undertaken unless there was a problem with the fuel. Tolson Aff. ¶ 34; Plaintiff's Exh.43 at Section 6.5. *Neville Chemical Company v. Union Carbide Corp.*, 294 F. Supp. 649 (D.Pa. 1968), affirmed in part and vacated in part on other grounds, 422 F.2d 1205 [**8] (3rd Cir.), cert. denied, 400 U.S. 826, 91 S. Ct. 51, 27 L. Ed. 2d 55 (1970) (holding that a fifteen day time limitation to give notice from delivery of the product was "manifestly unreasonable" and invalid under Section 1-204 of the U.C.C. where a defect in the product was not discoverable by ordinary inspection and testing); See, also, *Marr Enterprises, Inc. v. Lewis Refrigeration Co.,* 556 F.2d 951, 955 (9th Cir. 1977) ("Limited remedies under the U.C.C. have been held to fail of their essential purpose when defects in the goods are latent and not discoverable on reasonable inspection.")

15. The provision in the general conditions limiting the nature and extent of the damages recoverable by Liberty to the removal and replacement of the product also is unenforceable, because it too fails of its essential purpose. Section 2-719(2) of the U.C.C. provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." *Viking Yacht Co. v. Composites One LLC,* 385 F. App'x 195, 207-208 (3d Cir. 2010) (in case involving cracking of a gel coat that was used as a cosmetic finish and barrier to prevent water and other materials from damaging yachts, holding that limited remedy of repair or replacement found in parties' contract failed of its essential purpose, and stating "[p]laintiffs here were deprived of the substantial value of their bargain with [defendant]. After they had used the gel coat on the yachts and the gel coat cracked, the cost of the gel, about $3,000, was dwarfed by the cost of repairing the ships -- in Post's case it cost $279,000 per ship to repair. For Viking it cost $822,407.59 per ship to repair."); *Cox v. Lewiston Grain Growers,* 936 P.2d 1191, 1198 (App. WA. 1997) ("A limitation of remedies fails its essential purpose when the defect is latent and non-discoverable upon reasonable inspection.").

16. Bomin was negligent in failing to take adequate steps to protect its inventory and prevent its sale of contaminated fuel to Liberty when it had heard as far back as February 2018 that there were complaints in the industry of what become known as the "Houston bunker problem".

17. Bomin was negligent in failing to warn Liberty not to consume the bunkers suppled to the Vessel, when it knew of complaints of bad fuel in the industry and more significantly it had been notified of a claim of engine failure by the M/V Toronto, a vessel that received fuel sourced from the same tank and delivered by the same barge as the Vessel, only days before.

Dated: New York, New York
September 24, 2021

Respectfully submitted,

CARDILLO & CORBETT

*/s/ Tulio R. Prieto*\_\_\_\_\_
Tulio R. Prieto, Esq.
*Attorneys for Plaintiff*
145 Hudson Street, Suite 5C
New York, NY 10013
(212) 344-0464
tprieto@cardillocorbett.com

HILL, BETTS & NASH LLP

*/s/ James D. Kleiner*\_\_\_\_\_
James D. Kleiner, Esq.
Adam M. Wernicke, Esq.
*Attorneys for Plaintiff*
14 Wall Street, Suite 5H
New York, NY 10005
(212) 839-7000
jkleiner@hillbetts.com
awernicke@hillbetts.com