UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LIBERTY GLOBAL LOGISTICS LLC,

                              Plaintiff,

                                             19 Civ. 3842 (PAE)(SN)

      -against-


BOMIN BUNKER OIL CORP.,


                              Defendant.
------------------------------------------------------------x

## PLAINTIFF'S TRIAL BRIEF


### FACTS

On March 1, 2018, defendant Bomin Bunker Oil Corp. ("Defendant" or "Bomin"), as seller/supplier, and plaintiff Liberty Global Logistics LLC,[1] as buyer, entered a contract for the supply of marine fuel (bunkers) for the vessel LIBERTY PEACE (the "Vessel"). The terms of the supply contract were negotiated through a broker, Aaron Garza ("Garza") of Integr8 Fuels Inc. ("Integr8"). Efthimios Vassilas ("Vassilas"), the Vessel Operations Manager for the Vessel's operator, Liberty Maritime Corporation, negotiated the contract on behalf of Liberty and Mike Parrent ("Parrent"), Bomin's Marketing Manager, negotiated the contract on behalf of Bomin.

On February 28, 2018, Vassilas sent his original enquiry to a number of brokers via email, setting forth Liberty's requirements to supply the Vessel with heavy fuel oil ("HFO") and low sulfur marine gas oil ("MGO") at the Port of Beaumont on or about March 8, 2018. Vassilas Aff. ¶ 21. Garza was the first broker to advise Parrent of the Vessel's requirements, and as a

---

[1] Liberty Global Logistics LLC ("LGL" or "Plaintiff") and Liberty Maritime Corporation ("LMC" or "Managers"), are at times each and/or collectively referred to as "Liberty."

result Parrent proceeded to make all of Bomin's firm offers exclusively through Garza to meet those requirements at specified prices, with Bomin agreeing to pay Garza a commission of $1 per metric ton ("MT"). Garza Dep. 27:6-20; Plaintiff's Exh. 29.

Vassilas's original enquiry email contained all the essential terms and information for the transaction, including specifying the quantities for each grade of bunkers:

> **Subject: Liberty Peace 006 – Bunkers - Beaumont**
>
> **Please obtain firm brokered pricing for the following:**
> **1.    1,300 mt +/- 10% HFO RMG 380 – Sulphur max 3.50%**
> **2.    300 mt LSMGO – Sulphur max 0.10%**
> **ETA Beaumont Mar 08th**
> **FYI, we are reaching out direct to Peninsula for quotes.**
> **Please advise the suppliers you are quoting.**

Vassilas Aff. ¶ 21; Plaintiff's Exh. 3, pg. 9.

Negotiations were temporarily suspended by Vassilas on February 28, 2018 pending assessment of price movements in the bunker market. Vassilas Aff. ¶ 26. The next day, March 1, 2018, Vassilas called for renewed "firm" offers from Bomin, based on his original message" ("**please quote firm as per initial msg**"); and the parties' email negotiations resumed. Vassilas Aff. ¶ 27. Parent sent a firm offer via Garza to supply the HFO and MGO required by Liberty. Vassilas Aff. ¶ 29; Plaintiff's Exh. 29. Finally, as reflected in Garza's email to Vassilas of March 1, 2018, at 12:23 p.m. EST, he and Vassilas orally concluded the contract ("[a]s per telcom"), meeting all the terms set forth in Vassilas's original message:

> **Subject RE: LIBERTY PEACE 006-BUNKERS-BEAUMONT**
>
> **As per telcon, confirmed at $338//$571 mtw + Barging.**
>
> **Who are agents?**

Vassilas Aff. ¶ 32; Plaintiff's Exh. 3, pg. 1.

Garza immediately followed up with a similar email to Parrent, at 12:24 pm, confirming the deal had been reached and adding "Formals to follow." Garza dep. 44:11-21; Plaintiff's Exh. 34.

Throughout the negotiations on February 28 and March 1, 2018, neither Bomin nor the broker made any mention of Bomin's General Terms and Conditions of Sale ("General Terms"), which were never negotiated or agreed. Vassilas Aff. ¶ 40; Garza Dep. 82:1-23. At 1:16 p.m. on March 1, 2018, Nancy Awadallah of LMC's Purchasing Department emailed to Bomin a Purchase Order in which she had incorporated the financial details of the deal, as negotiated via the emails and concluded over the phone. Vassilas Aff. ¶ 34. Under "Remarks," she recapped: "Bomin" as the supplier of both grades of bunker, including the agreed HFO quantity range of "1,300 MT +/- 10%." Vassilas Aff. ¶ 35. Immediately thereafter, at 1:17 p.m., Garza and his colleague, Michael Flatley, each emailed a bunker "confirmation" to the parties in which they incorrectly stated the quantity of HFO as "1,300 MT – 1,300 MT," instead of the quantity range reflecting the agreed variance of 10% plus or minus, to wit: 1,170 MT – 1,430 MT. Vassilas Aff. ¶ 36-37; Plaintiff's Exh. 8. That same day, at 2:00 p.m., Garza emailed a follow-up confirmation to Vassilas (intending it to correct their clerical error), explaining in the subject field the change made below in that email: "AMENDED QTTY RANGE – BUNKER CONFIRMATION". Vassilas Aff. ¶ 38; Plaintiff's Exh. 9. However, in doing so he made another error, in deducting the 10% (130 MT) from the base quantity of 1,300 MT and incorrectly stated the lower quantity range for HFO as "1130 MT" instead of "1170 MT". Vassilas Aff. ¶ 38; Plaintiff's Exh. 3, pg. 9. Neither Flatley nor Garza's emails were intended in any way to amend the agreed quantity range. Garza Dep. 72:11-17.

In their bunker confirmations, Flatley and Garza made reference to the fact that they were nominating or confirming the bunker transaction "in accordance with applicable contractual terms and conditions of sale," namely, "seller's standard terms and conditions." Plaintiff's Exhs. 8 and 9.

Bomin's General Terms had never been brought to Vassilas's attention during the negotiations. Vassilas Aff. ¶ 40; see also, Plaintiff's Exh. 40. They contained a number of harsh provisions which would skew the bargain in Bomin's favor, including: (a) Clauses 8.1 and 8.2, barring "quality" claims for deficient or contaminated bunkers, after 14 days and 30 days, respectively, following the Vessel's receipt of bunkers on board; (b) Clause 5.1 which excluded and nullified implied warranties; and (c) Clauses 5.7 and 14.1 limiting damages payable by Bomin to the cost of the bunkers, in effect nullifying both express and implied warranties and barring recovery of other much larger losses, for example, as a consequence of damage caused by contaminated fuel to the vessel's engine. Plaintiff's Exh. 40.

Such terms would represent a material alteration in the deal struck over the telephone by Vassilas and Garza. While Vassilas never expressly objected to the emails from Garza and Flatley, he never expressly consented to Bomin's General Terms.

When on May 16, 2018, after Vassilas gave notice of the claim via Garza, Bomin responded that "Bomin's claim period is 14 days from the date of delivery" and that as such "this claim is time barred." Vassilas Aff. ¶¶ 40 and 49; Plaintiff's Exh. 13.

Despite Bomin's earlier assertion of time bar, in June 2018, Bomin agreed to make Liberty whole as to the cost of the contaminated bunkers remaining on board. Vassilas Aff. ¶¶ 56-63. In agreeing to such, albeit limited, compensation, Bomin waived any time bar defense regarding Liberty's claim as a whole.

According to Plaintiff's expert, Adrian Tolson, there is no uniform custom and practice under which Bomin's General Terms could have become part of the contract based on Liberty's failure to expressly object to such terms, much less so, when they had never been mentioned by Bomin nor bargained for during the parties' negotiations.

Starting as early as March 13, 2018, with the M/V TORONTO, Liberty received claims in respect of harmful and/or deficient quality of its bunkers from in respect of no fewer than sixteen (16) vessels, including the Vessel. As active suppliers of marine fuel in the U.S. Gulf, they were evidently aware of the problems relating to the fuel they supplied to Liberty in February, as explained, below. Thus Bomin was aware of the problems with its fuel, as many as eight weeks before the Vessel switched to the Bomin fuel on April 24, 2018. Bomin could and should have issued such a warning and were negligent (at best) in failing to take any action whatsoever to raise the alarm.

Chris Nelson, Bomin's CEO, who testified as its Rule 30(b)(6) witness, admitted that Bomin knew as far back as February 2018 that there were complaints in the industry of problems with bad fuel, problems which became known as the "Houston Bunker Problem" [Nelson Dep. 65:3-16]. The "Houston Bunker Problem". was an explosion of claims in in early 2018, after vessels supplied with marine fuel oil or bunkers in the United States Gulf Coast complained of defective bunkers found to contain contaminants not detectable by common testing, but only by enhanced testing, not usually undertaken unless engine problems arose upon consumption of the fuel. Mr. Nelson testified that Bomin undertook "sediment testing" to protect his inventory and not enhanced testing that could actually detect potentially harmful substances.

Whatever Mr. Nelson actually did was far less than was required to protect ship owners such as Liberty. Even more shocking was Bomin's failure to warn Liberty not to consume the

fuel it had supplied to Liberty after the M/V Toronto complained of engine failure.  The Toronto

had received fuel delivered by the same bunker barge sourced from the same shore tank only two

days before the Vessel was bunkered.  By that time, Bomin was aware that the "Houston Bunker

Problem" had hit its inventory.

I.     **DEFENDANT'S TERMS, WHICH IMPOSED A TIME BAR IF NO COMPLAINT
       WAS MADE WITHIN 14 DAYS, DISCLAIMED WARRANTIES OF
       MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND
       LIMITED DAMAGES TO THE COST OF THE BUNKERS, EXCLUDING ALL
       INDIRECT AND CONSEQUENTIAL DAMAGES, DID NOT BECOME A PART
       OF THE PARTIES' CONTRACT.**

Defendant Bomin argues that clauses that it unilaterally inserted as part of its standard

terms and conditions form: 1) operate to bar recovery by Liberty because Liberty did not submit

a claim within 14 days of receipt of the bunkers; 2) prohibit Liberty's claims based on breach of

warranty or fitness for a particular purpose; and 3) limit Liberty's damages to a refund of the cost

it paid for the defective bunkers, and prohibit its recovery for the considerable indirect and

consequential damages it incurred. Bomin is incorrect. Under § 2-207 of the Uniform

Commercial Code ("U.C.C."), N.Y. U.C.C. § 2-207,  Bomin's standard terms and conditions are

not part of the parties' contract because the contract was made orally, the terms of the oral

agreement did not include Bomin's standard terms and conditions, and Bomin's standard terms

and conditions would materially alter the terms of the oral contract.

### Oral Contracts Enforceable Under Maritime Law

Under maritime law, oral contracts are enforceable. *Kossick. v. United Fruit Company*,

365 U.S. 731, 81 S.Ct 886, 6 L.Ed. 2d 56 (1961); *Great Am. Lines v. Global Petroleum Corp*.,

1997 U.S.Dist. LEXIS 24472 (D.N.J. 1997). State law may supplement general federal maritime

law but may not directly contradict it. *Great Am.* at *10, citing *Southworth Mach. Co., Inc., v.*

*F/V Corey Pride,* 994 F.2d 37, 41 (1st Cir. 1993). Such law may include the U.C.C.; indeed "the U.C.C. is considered a source for federal admiralty law." *Id.* (citing *Southworth* at 40 n.3).

### UCC § 2-207 Governs

This case is governed by UCC § 2-207, which provides:

§ 2-207. Additional Terms in Acceptance or Confirmation.

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

**(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:**

> (a) the offer expressly limits acceptance to the terms of the offer;
> **(b) they materially alter it; or**
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

(emphasis added).

The Official Comments to the section provide, in part:

> 2. This section is intended to deal with two typical situations. **The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed. …**
>
> **3. Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party.** If, however, they are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time.

**4. Examples of typical clauses which would normally "materially alter" the contract and so result in surprise or hardship if incorporated without express awareness by the other party are: a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches;** a clause requiring a guaranty of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; **a clause requiring that complaints be made in a time materially shorter than customary or reasonable.**

(emphasis added).

The parties in this case negotiated extensively via emails and then concluded the contract orally on March 1, 2018 around noon (agreeing on the price of each grade) encompassing all the terms and requirements of Liberty's (Vassilas's) original inquiry, including: name of vessel, the two grades of fuel, quantity, quality, date and port of delivery and the incidental expenses of the bunkering barge. Vassilas Aff. ¶ 18-33; Plaintiff's Exh. 3. Thereafter, at 1:16 pm on March 1, Nancy Awadallah, acting for Liberty, sent a Purchase Order recapping the terms of the sale. Vassilas Aff. ¶ 34; Plaintiff's Exhs. 6 and 7. The Liberty Purchase Order was limited to recapping the transaction as agreed, and added no different or additional terms. Vassilas Aff. ¶ 35; Plaintiff's Exh. 7. At 1:17 pm on March 1, Aaron Garza, the broker, and his colleague, Michael Flatly, sent email confirmations to buyer and seller confirming the terms and stating, at the end of the email "[n]omination accepted in accordance with seller's standard terms and conditions. Buyers should notify us if they require a copy." Vassilas Aff. ¶ 36; Plaintiff's Exh. 8. At 2:00 pm, Garza re-sent the confirmations to the parties, amending the quantity for the HFO bunker to correct a clerical error he had made in his first email confirmation; this email likewise stated at the end "[n]omination accepted in accordance with seller's standard terms and

conditions. Buyers should notify us if they require a copy."[2] Vassilas Aff. ¶ 37-38; Plaintiff's Exh. 9.

Bomin's "standard terms and conditions" included, **_inter alia_**: 1) a clause that required the Buyer to make any claim as to quality no later than 14 days after receipt of the product, followed by written notice of the claim within 30 days of receipt of the product, or be waived and absolutely time-barred [Sections 8.1. and 8.2]; 2) a clause that excluded and disclaimed "implied conditions and warranties, including the warranties of merchantability and fitness for a particular purpose" [Section 5.1]; and 3) clauses that limited recoverable damages to the price of the Products supplied under the Contract, and barred "special, indirect, consequential, punitive or exemplary damages of any kind…"[Sections 5.7 and 14.1].

This case, therefore, is precisely the type of situation that UCC § 2-207 was designed to address: "the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed." [Official Comment 2 to § 2-207]. Section 2-207(2) provides that such additional terms **do not become part of the parties' contract if** they "materially alter" it; instead, per § 2-

---

[2] Explained above, the agreement was for two bunkers: one at 300 MT and the other at 1,300 MT +/- 10%. The first confirmation from the broker, Garza's colleague (Michael Flatly), incorrectly quoted the quantity of the second bunker as "1300 MT – 1300 MT", instead of the agreed range of quantities (1170 MT – 1430 MT), and the follow-up confirmation sent by Garza reflected the range, but this time, with a mathematical error in deducting the 10% or 130 MT from the 1300 MT base. Garza's second email in no way reflected a "change in agreed quantity" based on further negotiations between the parties, as contended in Defendant's expert report, but rather reflected the broker's correction of his earlier clerical error that misrepresented the parties' oral agreement. That intention is confirmed by the follow-up confirmation to Bomin/Parrent which explained: "*AMENDED QTTY RANGE AS PER ORIGINAL ENQUIRY*". Plaintiff's Exh. 9; see also, Garza Dep. 72:11-17 (Garza stating "It's not amended from that deal in the original email that Tim sent. It had plus or minus 10 percent. And that's what I amended.").

207(3), the contract consists of the terms on which the parties agreed, together with "any supplementary terms incorporated under any other provisions of this Act [the UCC]."

### **Bomin's General Terms "Materially Alter" the Contract**

There is no question that the clauses described above in Bomin's General Terms "materially alter" the contract. Official Comment 4 to § 2-207, in fact, specifically cites "a clause requiring that complaints be made in a time materially shorter than customary or reasonable" as one which would "materially alter" the contract would not be incorporated into it unless expressly agreed to by the other party. Bomin's clauses [Sections 8.1. and 8.2] purporting to time-bar a claim if not made within 14 days of receipt of the bunkers, followed by written notice of the claim within 30 days, imposes time limits "materially shorter than customary or reasonable," particularly where the bunkers' deficiencies could not be detected until they caused damage to plaintiff's engines, and plaintiff complained immediately thereafter. Plaintiff's Exh. 40.

Likewise, a clause "negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches, " like Bomin's Section 5.1 is specifically cited in Official Comment 4 to § 2-207 as one which would "materially alter" the contract and would not be incorporated into it. Plaintiff's Exh. 40. Clauses that purport to limit damages to the price of the Products supplied under the Contract, and bar "special, indirect, consequential, punitive or exemplary damages of any kind…," like Bomin's Sections 5.7 and 14.1, are similar to or more restrictive than clauses that negate standard warranties, and would also so "materially alter" the contract that they would not be incorporated into it. Plaintiff's Exh. 40.

**The Case Law is in Accord**

Case law is in accord. *Great Am. Lines v. Global Petroleum Corp*., 1997 U.S.Dist.
LEXIS 24472 (D.N.J. 1997) involved a case similar to this one: plaintiff buyers sought to
recover losses for engine damage, caused by contaminated fuel, and defendant sellers argued that
clauses contained in its "Global Terms" which, respectively, "impose[d] a strict time limitation
for [plaintiff buyer] to complain about defects, disclaim[ed] warranties of merchantability,
fitness or suitability for a particular purpose, and disclaim[ed] liability for consequential, indirect
or special losses or special damages of any kind" were effective to bar the claims asserted by
plaintiffs. *Id.* at *9. As in this case, the *Great Am.* parties agreed orally through a broker on the
essential terms of the contract, and later the same day the broker sent a confirming telefax
restating the essential terms agreed upon but adding the provision "nomination accepted in
conformance with seller's normal terms and conditions." See generally, Vassilas Aff.

The Court in *Great Am.*, [Debevoise, J] rejected the sellers' arguments that the restrictive
clauses in its Global Terms were incorporated into the parties' contract. Judge Debevoise stated:

> U.C.C.§ 2-207 governs. The terms of the contract were agreed to by the parties prior
> to [seller's] reference to the Global Terms in the Confirming Telefax. As a result, under
> U.C.C. § 2-207 the only reason for the Global Terms to be included as part of the contract
> would be if they did not materially alter the agreement.

> *Id.* at *17-18.

Judge Debevoise went on to hold that all three restrictive clauses in the Seller's "Global Terms"
materially altered the parties' oral agreement, and therefore could not be incorporated into the
contract.

First, Judge Debevoise rejected the seller's argument that its requirement that the buyer's
complaints about bunker oil quality be made within a 10-day period was "reasonable," and
concluded that it was a "materially shorter than customary or reasonable term" that, under

Comment 4 to U.C.C. § 2-207, materially altered the agreement. He relied in part on his finding

that "it is not customary industry-wide practice to submit fuel oil samples for analysis before a

problem indicating defective fuel oil arises. [Plaintiff/buyer's] normal practice was to retain

bunkers samples and have them analyzed later in the event that a problem arose. As one of

[plaintiff's] technical advisers states, 'symptoms of an engine problem stemming from defective

fuel oil do not manifest themselves immediately, but can easily take ten days or more." *Id*. at 19-

20. Similarly in the instant case, the 14-day notice period Defendant seller seeks to enforce is

inherently unreasonable as it was not industry wide-practice to employ specialized testing upon

receipt of bunkers, and contaminants in the oil are detected only when problems with the fuel

arise. Chris Fisher Aff. ¶ ___; see also, Adrian Tolson Aff. ¶ 34. As plaintiff's expert stated, "any

possible time bar provision would be particularly troubling for buyers supplied fuel with

contaminants because they are not normally detectable by standard quality control testing of

samples taken at the time of supply. Contaminants require non-standardized GCMS testing,

which is normally done only if and when a problem arises. Fisher Aff. ¶ ___; see also, Tolson

Aff. ¶ 34. Problems are only likely to occur at some time after the vessel commences using the

fuel and very likely after the time bar has expired…..Liberty received the GCMS results on June

6, 2018, some 90 days after the original March 8 delivery." Tolson Aff. ¶ 23; Plaintiff's Exh. 43

at Section 6.5, p. 7.

As to the clause purporting to disclaim implied warranties of merchantability and fitness,

Judge Debevoise held:

> [a]n implied warranty of merchantability is read into all contracts of sale under U.C.C. §
> 2-314, and under U.C.C. § 2-315 there is an implied warranty that the goods shall be fit
> for a particular purpose where the seller has reason to know of such particular purpose for
> which the goods are required and the buyer is relying on the seller's skill or judgment to
> furnish suitable goods. Under U.C.C. § 2-316 the parties to a contract may agree to
> exclude or modify these warranties. Official Uniform Comment 4 to U.C.C. § 2-207

states that "a clause negating such standard warranties as that of merchantability or fitness for a particular purpose" is an example of a typical clause which would materially alter an agreement. Clause 15(B) is just such a clause and it must be concluded that the addition of Clause 15(B) "would, as a matter of law, substantially alter the distribution of risk between" the parties. …See [*Glyptal v. Englehard Corp.*, 801 F. Supp.887 at 894 (D.Mass. 1992) ("Courts have held consistently that warranty disclaimers materially alter a contract under section 2-207(2)(b)").

*Id.* at 23-24. Defendant's efforts in the instant case to disclaim such implied warranties also constitute "material alterations" to the implied warranties read into the parties' basic oral agreement and must likewise be rejected.

As to the clause purporting to disclaim incidental and consequential damages, Judge Debevoise noted, "Under U.C.C. § 2-714 a buyer may recover incidental and consequential damages resulting from a seller's breach. Consequential damages include 'any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know...,' U.C.C. § 2-715(2)(a), and 'injury to person or property proximately resulting from any breach of warranty.' U.C.C. § 2-715(2)(b)." *Id.* at 25. While consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable, such a limitation of remedies "substantially alters the distribution of risk" between the parties from the *status quo* provided by the U.C.C. They therefore are considered "material alterations" to basic agreements under U.C.C. § 2-207 that do not become part of such agreements unless ***expressly agreed to***;  simple continued performance by the other party with constructive or actual knowledge of these disclaimers does not constitute acceptance of the terms. Id at 25-27, and cases cited therein.  So too in the instant case, Defendant's attempts to unilaterally disclaim incidental and consequential damages must be considered mere proposals that "materially altered" the parties oral contract and thus were not incorporated into it.

Second Circuit cases likewise hold that "material alterations are those that would result in surprise or hardship if incorporated without express awareness by the other party" *Tosco. Corp.*

*v. Oxygenated Mktg and Trading A.G.*, 1999 U.S. Dist. LEXIS 7903 at * 13 (May 20, 1999) (citing U.C.C. § 2-207 cmt. 4). "Examples of clauses which would normally materially alter a contract include, e.g., those negating standard warranties of merchantability or fitness for a particular purpose. *Tosco*, *id.* at *13 n.7. Generally, disclaimers of warranties or limitations on liability materially alter an agreement. *St. Charles Cable Co. v. Eagle Comtronics, Inc.*, 687 F. Supp. 820, 827 (S.D.N.Y. 1988) (excluding clauses in defendant seller's confirmatory "sales acknowledgment form" that purported to make plaintiff buyer responsible for attorney's fees and indemnification arising out of any contract dispute as such clauses materially altered the contract, but permitting the limited "repair or replace" warranty to be enforced where evidence demonstrated that the parties' oral agreement contemplated only a repair or replace warranty, and therefore the parties' negotiated oral contract would not be altered).

### Custom and Practice Asserted by Bomin's Expert is Refuted

[Defendant Bomin's attempt to circumvent the U.C.C. and case law by having its expert recite that "It is … the custom and normal practice in the marine fuel industry that a seller's standard terms and conditions become a part of the contract for the sale of marine fuel unless objected to by the buyer" [Ignozzi-Little Report, p. 3] must be rejected. If this were so, there would be no need for U.C.C. § 2-207. "Custom and practice" cannot supersede statutory and case law requirements.

Moroever, Bomin's asserted custom and practice is refuted by Plaintiff's expert Tolson, who states in his Report:

> Ignozzi-Little goes on to say that it is, "…normal practice in the marine fuel industry that the seller's standard terms and conditions become part of the contract for the sale of marine fuel unless objected to by the buyer". This is what a supplier wishes for, but just because the GT&Cs are mentioned does not mean that the buyer has accepted them as part of the contract. In Liberty's case, the terms presented post agreement that were not discussed when the deal was being finalized have not been agreed to, and there is no evidence of any

effort made by Bomin to get Liberty's agreement. The suppliers' preference, as discussed above, will always be to have their GT&Cs mentioned in the confirmation and for them to go unnoticed by the buyer. It is "normal practice" for suppliers to hope that the terms are part of the sales contract and as a former supplier this was my hope, knowing full well that most of these terms had not been clearly presented in advance to the buyer and that if there was a dispute, the terms could and would be challenged in court. It is not "normal practice" for suppliers' sales terms to become part of the supply agreement simply because they were referred to in an e-mail claiming to confirm an agreement and were not objected to by the buyer.

Plaintiff's Exh. 43 at Section 6.10, p. 5

## II. DEFENDANT WAIVED THE 14-DAY TIME BAR FOR SUBMISSION OF CLAIMS BY REPLACING THE BUNKERS AND ACKNOWLEDGING THAT THE OIL IT SUPPLIED WAS OFF-SPEC.

Defendant Bomin argues that the restrictive 14-day period for Plaintiff Liberty to make a claim "with regard to quality" of the bunkers (and its additional requirement that a formal written claim be made within 30 days) was incorporated into the parties' agreement, which Plaintiff disputes. See Point I, above. Even if the time limits did apply at one point, however, Defendant has waived the right to enforce them, since after learning that the fuel was contaminated it bought back the bunkers from Plaintiff and informed its own supplier that the bunker fuel was off-spec. Vassilas Aff. ¶ 52-63; see also, Plaintiff's Exhs. 14; 15; and 16.

The provisions in Defendant's general conditions of sale and delivery regarding time limits to make claims state as follows:

8.2 Any claims made by Buyer with regard to quality must be made in writing to Seller immediately upon detection of the alleged defect, and in any event no later than within fourteen (14) calendar days of receipt of the Product. The foregoing preliminary notice shall be followed by a formal written notice of claim, within thirty (30) calendar days from receipt of the Product, to Seller containing all details necessary to allow evaluation of the claim.

8.3 In any event, should buyer fail to present a claim in writing to the Seller as to quantity or quality within thirty (30) calendar days of the date of receipt of the Product, any such claim by the Buyer shall be deemed to be waived and absolutely time-barred. The Buyer's submission of any claim hereunder does not relieve it of the responsibility to make payment

in full for the Products supplied by the Seller. This provision shall survive a termination of the Contract.

Plaintiff's Exhs. 40.

Plaintiff's first indication of possible problems with Defendant's bunker fuel was not until two months after receipt of the fuel, when the Vessel's three diesel generators seized and could not be restarted due to excessive wear on the generators' plungers and barrels and carbon build up. Theodore Makrinos Dec. ¶ 13; see also, Fisher Aff. ¶ 33. As a result of the failure of the three generators and loss of all electrical power, the main engine shut down causing the Vessel to lose all power and propulsion on May 12, 2018, mid-voyage in the Red Sea proceeding from Aqaba, Jordan, to Constanta, Romania. Makrinos Dec. ¶ 13; see also, Fisher Aff. 16. The Vessel's Master was forced to call for the emergency assistance of tugs that towed the Vessel to Port Suez. Makrinos Dec. ¶ 26. The Vessel underwent repairs to its generators and main engine while at Port Suez and also at Piraeus in 2018. The Vessel did not consume any of the remaining fuel which had been supplied by Bomin. Makrinos Dec. ¶ 26. The Vessel eventually returned to Beaumont. Makrinos Dec. ¶ 32. On June 21, 2018, Bomin bought back the remaining contaminated fuel which had not been consumed by the Vessel and while at Beaumont the Vessel was de-bunkered. Makrinos Dec ¶ 32; see also, Vassilas Aff. ¶ 63.

It was subsequently learned that the Vessel's filters had been blocked by the presence of contaminants in Bomin's fuel. Fisher Aff. ¶ 15 and 30; see also Makrinos Dec. ¶ 10. The fuel supplied by Bomin to the Vessel was represented by Bomin to be in compliance with the specifications set forth in ISO 8217:2010. On May 31, 2018, Bomin put its supplier on notice for the supply of off-specification product, citing the section of ISO 8217 that requires the fuel to be free of any substance which "adversely affects the performance of the machinery." Plaintiff's Exh. 73. Three other vessels which received fuel supplied by Bomin in March, 2018 from the same shore tank as

the LIBERTY PEACE, complained of engine problems to Bomin.  Bomin agreed to buy back the fuel it had supplied and de-bunker two of those three vessels.[3]

Under the N.Y. U.C.C., as interpreted in maritime law cases, evidence as to the manner in which the contract was actually performed by the parties may operate to show that one party has waived certain express provisions of the contract. *Great Am. Ins. Co. v. M/V Handy Laker*, 2002 U.S. Dist. LEXIS 26378, *25-28, 2003 AMC 116, aff'd, 348 F.3d 352 (2d Cir. 2003) citing *McNamara v. Tug "Diana L. Moran", No. 87 Civ. 3096*, 1989 U.S. Dist. LEXIS 10634, at *18-19 (S.D.N.Y. Sept. 7, 1989) (holding that purchaser waived F.O.B. portion of contract through its subsequent actions and was estopped from enforcing it). The *Great Am.* Court stated:

> Courts have held that "a waiver under the Uniform Commercial Code may take place through conduct as well as words." *Federal Express Corp. v. Pan American World Airways, Inc*., 623 F.2d 1297, 1302-03 (8th Cir. 1980) (applying New York law to contract at issue, and holding conduct of party after the formation of the contract waived the express terms of the contract where actions were inconsistent with the terms of the contract); see *T. J. Stevenson & Co. v. 81,193 Bags of Flour, 629 F.2d 338, 365-66* (5th Cir. 1980) (applying U.C.C. §§ 2-208 and 2-209, performance of the contract waived the formal notice provisions in the contract). The U.C.C.'s waiver principle is generally considered equitable in nature. Thus, the waiver provisions exist because
>
>> 'the Code rejects the notion that just because the parties have entered into a "contract" something magical has occurred which prevents any change of that contract without all of the elements of a new contract. The Code's concept of contract is that of a continuing relationship between the parties, a relationship which can be changed by them as they move from the negotiation stage to complete performance.'

*Great Am.* at 25-26, *citing T.J. Stevenson & Co*., 629 F.2d at 366 (quotations and citation omitted).

Additionally, courts generally hold that whether waiver has been established by the conduct of the parties during the performance of the contract is a question of fact. *Great Am.* at 27-28, citing *Allied Plywood Corp. v. Western Pulp, Inc.*, 1994 U.S. Dist. LEXIS 3038, at *11 (S.D.N.Y.

---

[3] Bomin's witness, Vincent Terraciano, admitted in deposition that these and several other vessels supplied by Bomin were also part of the "Houston Bunker Problem." See Vincent Terraciano Dep. pg. 59-61.

March 17, 1994) (denying summary judgment where "factual finding must be made to determine whether the … contract was modified pursuant to UCC §§ 2-208 or 2-209, by oral agreement, course of performance, or conduct amounting to waiver or estoppel"); *Cliffstar Corp. v. Riverbend Prods., Inc.*, 750 F. Supp. 81, 88 (W.D.N.Y. 1990) (denying motion for summary judgment where issue of fact existed as to whether party waived express contractual right through conduct).

Bomin's actions in buying back 850 MT of the unused bunker fuel from Liberty more than three months after receipt of the fuel (and more than two months after the strict 14-day period for notification of a "claim...with regard to quality" set forth in its general conditions of sale and delivery had elapsed) operates as a waiver of the provision. See Vassilas Aff. ¶ 56-63. Bomin's actions in compensating Liberty after the 14-day and 30-day provisions had elapsed are inconsistent with what Bomin claims were the terms of the parties' contract. Therefore the time limits found in Section 8.2 and 8.3 are unenforceable.

## III. PLAINTIFF HAS A CLAIM FOR BREACH OF EXPRESS WARRANTY EVEN IF DEFENDANT'S GENERAL CONDITIONS APPLY.

Even if Defendant's general conditions for sale and delivery were incorporated into the parties contract and were not waived, which Liberty disputes, this does not bar or limit Liberty's claim for damages or preclude a claim for breach of warranty. The emails that attempt to incorporate the General Terms represent that the bunker fuel to be supplied by Bomin possessed the specifications set forth in the ISO standard, 8217:2010. See Plaintiff's Exhs. 8; 9; and 73. Such affirmation constituted an express warranty under U.C.C. § 2-213[4] that the fuel would comply with

---

[4] U.C.C. § 2-213(1)(a) provides: "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." U.C.C. § 2-213(2) provides: "[i]t is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty…"

the requirements set forth in the ISO Standard. Those requirements were not met by Bomin's fuel which contained contaminants that adversely affected the Vessel's machinery. Therefore, even if the general conditions for sale and delivery had been incorporated, Bomin would be in breach of warranty.

## IV. EVEN IF INCORPORATED, BOMIN'S GENERAL TERMS ARE UNENFORCEABLE.

The very short time limit contained in the general conditions of 14 days to assert a claim is unenforceable as wholly inadequate under the facts of this case pursuant to UCC 1-204. As discussed above, the contaminants present in the fuel were not discoverable by ordinary testing – enhanced testing was required which would not be undertaken unless there was a problem with the fuel. Tolson Aff. ¶ 34; Plaintiff's Exh.43 at Section 6.5. *Neville Chemical Company v. Union Carbide Corp.*, 294 F. Supp. 649 (D.Pa.1968), affirmed in part and vacated in part on other grounds, 422 F.2d 1205 [**8] (3rd Cir.), cert. denied, 400 U.S. 826, 91 S. Ct. 51, 27 L. Ed. 2d 55 (1970) (holding that a fifteen-day time limitation to give notice from delivery of the product was "manifestly unreasonable" and invalid under Section 1-204 of the UCC where a defect in the product was not discoverable by ordinary inspection and testing); See, also, *Marr Enterprises, Inc. v. Lewis Refrigeration Co.,* 556 F.2d 951, 955 (9th Cir. 1977) ("Limited remedies under the UCC have been held to fail of their essential purpose when defects in the goods are latent and not discoverable on reasonable inspection.")

The provision in the general conditions limiting the nature and extent of the damages recoverable by Liberty to the removal and replacement of the product also is unenforceable, because it too fails of its essential purpose. Section 2-719(2) of the U.C.C. provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." *Viking Yacht Co. v. Composites One LLC,* 385 F. App'x 195, 207-

208 (3d Cir. 2010) (holding, in case involving cracking of a gel coat that was used as a cosmetic finish and barrier to prevent water and other materials from damaging yachts, that limited remedy of repair or replacement found in parties' contract failed of its essential purpose, and stating "[p]laintiffs here were deprived of the substantial value of their bargain with [defendant]. After they had used the gel coat on the yachts and the gel coat cracked, the cost of the gel, about $3,000, was dwarfed by the cost of repairing the ships—in Post's case it cost—$279,000 per ship to repair. For Viking it cost $822,407.59 per ship to repair."); *Cox v. Lewiston Grain Growers,* 936 P.2d 1191, 1198 (App. WA. 1997) ("A limitation of remedies fails its essential purpose when the defect is latent and non-discoverable upon reasonable inspection.").

Likewise here, the cost of the bunker replacement is far outweighed by the damage to the Vessel's engines and other damages incurred by Liberty, and the defect in the bunker fuel was latent and non-discoverable upon reasonable inspection. Therefore, the limitations contained in the general conditions do not bar or limit Liberty's claims, and Liberty is entitled to pursue all damages provided under the U.C.C. for breach of express warranty.

*[Intentionally left blank]*

## CONCLUSION

Based on the foregoing Liberty is entitled judgment against Bomin, for its damages as demonstrated by the evidence to submitted, in the sum of at least $1,422,765.52, with costs, attorneys' fees and prejudgment interest, together with such other relief as the Court shall deem just.

Dated: New York, New York
September 24, 2021

Respectfully Submitted,

CARDILLO & CORBETT

*/s/ Tulio R. Prieto*
Tulio R. Prieto, Esq.
*Attorneys for Plaintiff*
145 Hudson Street, Suite 5C
New York, NY 10013
(212) 344-0464
tprieto@cardillocorbett.com

HILL, BETTS & NASH LLP

*/s James D. Kleiner*
James D. Kleiner, Esq.
Adam M. Wernicke, Esq.
*Attorneys for Plaintiff*
14 Wall Street, Suite 5H
New York, NY 10005
(212) 839-7000
jkleiner@hillbetts.com
awernicke@hillbetts.com