WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
Attorneys for Defendant Bomin Bunker Oil Corp.

Frederick W. Reif
frederick.reif@wilsonelser.com
Nathan T. Horst
nathan.horst@wilsonelser.com
150 E 42nd Street
New York, NY 10017
(212) 490-3000 – Telephone
(212) 490-3038 – Facsimile

Kevin T. Dossett, *admitted pro hac vice*
kevin.dossett@wilsonelser.com
909 Fannin Street #3300
Houston, TX 77010
(713) 353-2000 – Telephone
(713) 785-7780 – Facsimile

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x
                  :
LIBERTY GLOBAL LOGISTICS LLC,    :
                  :
           Plaintiff,     :     **ECF Case**
                  :
   -against-            :
                  :
BOMIN BUNKER OIL CORP.,       :    Case No: 19-cv-03842-PAE
                  :
           Defendant.    :
                  :
--------------------------------------------------------- x

## BOMIN BUNKER OIL CORPORATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE UNITED STATES DISTRICT COURT:

      COMES NOW Defendant, Bomin Bunker Oil Corporation, submitting the following Proposed

Findings of Fact and Conclusions of Law for consideration by the Court:

**I.    PROPOSED FINDINGS OF FACT**

    *A.    Introduction*

1.    Plaintiff Liberty Global Logistics LLC ("Liberty") brought this admiralty action

against Defendant Bomin Bunker Oil Corporation ("Bomin") for damages to the *M/V Liberty Peace*, its engines and machinery, allegedly caused by Bomin supplying marine fuel to the vessel that was contaminated by chemical waste. (Plaintiff's Verified Complaint at ¶ 13). Liberty has asserted claims against Bomin for breach of contract, breach of express warranty, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, and negligence. (Plaintiff's Verified Complaint at ¶¶ 18-27).

2. The *M/V Liberty Peace* is a 58,107 gross metric ton vehicle carrier measuring 200 meters in length and having a beam of 32 meters. It was built in 2017. It is propelled by a single Hyundai-MAN B&W 6S60ME-C8.5-T main engine rated at 12213 kW at 100.4 RPM. Electrical Power is provided by two Hyundai-Himsen 7H21/32 diesel generator engines rated at 1436 kW at 900 RPM and one Hyundai-Himsen 5H21/32 diesel generator engine rated at 900 kW at 900 RPM. (Daly Decl. at ¶ 8).

3. At all relevant times, Liberty was the bareboat charterer of the *M/V Liberty Peace*. (JX 1; DX 206) Liberty Maritime Corporation ("LMC") operated the vessel under a Vessel Operating Management Agreement with Liberty. (JX 2; DX 207).

4. Bomin is a physical supplier of marine fuels, referred to in the industry as "bunkers," with operations in Houston and other ports on the Gulf Coast of the United States. (Nelson Decl. at ¶ 4). As part of its storage infrastructure that is necessary to operate its bunker supply business, Bomin leases Tank 25-11, Tank 25-12, Tank 55-6, and Tank 100-3 from Pelican Island Storage Terminal, LLC, in Galveston, Texas, which offers storage and transshipment of bulk liquid products. (*Id.*) These tanks are replenished on a rolling basis by intra-terminal transfer, tank-to-tank transfer, or vessel to tank transfer. (*Id.*)

5. Bomin has two tank barges under long-term time charter that load bunkers at the

Pelican Island Storage Terminal for delivery to customers in the Port of Houston and surrounding U.S. Gulf Coast ports. (Nelson Decl. at ¶ 5). These tank Barges include the MGI 2331 and MGI 2332. (*Id.*) These tank barges are owned by MGI Marine, LLC. (*Id.*) MGI Marine, LLC, is in turn is beneficially owned by Bomin (25%) and Centerline Logistics Corporation (75%), which was formerly known in 2018 as Harley Marine Services Inc. (*Id.*).

### B.    *The Underlying Bunker Transaction*

6.     On February 28, 2018, Mike Parrent, Bomin's Marketing Manager, received email correspondence as a blind copy recipient from Aaron Garza, then a broker for Integr8 Fuels Inc. requesting firm brokered pricing of 1300 metric tons of RMG 380 high sulfur fuel oil, plus or minus ten percent, and 300 tons of low sulfur marine gas oil (LSMGO") for "Liverty" Maritime, which he understood to be LMC. (DX 5; DX 29; Parrent Decl. at ¶ 4).

7.     In the context of this transaction to procure marine fuel for LMC, Aaron Garza, the broker, was working for LMC and trying to secure the best deal possible for LMC. (Garza Dep. at 64:20 to 65:25; Ignozzi-Little Decl. at ¶ 10). Throughout the negotiations Garza was working on behalf of LMC and not Bomin, though it is the custom in the bunker fuel industry that a broker works for a vessel owner or operator but is paid a commission by the physical supplier of the bunkers. (Garza Dep. at 68:2 to 68:8).

8.     Parrent responded to Garza's inquiry by providing the price of $351/$582 MTW, which corresponded to a firm price of $351 per metric ton for the RMG 380 and LSMGO requirements, respectively, and advised Mr. Garza that these prices included the customary industry commission of $1 per metric ton for Integr8 as broker. (DX 5; Parrent Decl. at ¶ 5). Due to an interim change in market conditions, Bomin amended this quote to $338/$571 MTW for the RMG 380 and LSMGO requirements, respectively. (*Id.*)

9.    In response to Parrent's quote of $337/$570 MTW for the RMG 380 and LSMGO requirements, respectively, and $1 per metric ton commission, Garza responded "Confirmed" at the amended quote price of $338/$571 MTW. (DX-16; DX-18; Parrent Decl. at ¶ 9). Garza also advised that "Formals" would follow. (*Id* DX-17; DX-37; Parrent Decl. at ¶ 9.). Garza's employer, Integr8 Fuels Inc., required that there be a written nomination with terms in order to have a deal. (Garza Dep. at 69:11 to 69:14).

10.    Integr8 Fuels Inc. issued a Bunker Nomination confirmation document for the Bunker transaction to LMC, reflecting agreement to a price term of $338 per metric ton for the RMG 380 fuel and a price of $571 per metric ton for the LSMGO fuel. (DX-20) (the "Bunker Nomination"). The Bunker Nomination stated, in part:

> \* THIS NOMINATION IS BEING SENT TO BOTH THE BUYER AND
> THE SELLER.
> \* NOMINATION ACCEPTED IN ACCORDANCE WITH SELLER'S
> STANDARD TERMS AND CONDITIONS. BUYERS SHOULD NOTIFY
> US IF THEY REQUIRE A COPY.

(DX-20; DX-58). Bomin also received a copy of this Bunker Nomination. (Parrent Decl. at ¶ 10).

11.    The Bunker Nomination contained a quantity change concerning the RMG 380 fuel. It stated the desired quantity as 1,300-1,300 metric tons (DX-20, p. 1), instead of the plus or minus 10% range called for in LMC's original tasking of Garza. (DX-3).

12.    Accordingly, Bomin issued its own "Confirmation of Bunker Sale" (the "Bomin Confirmation") to Garza, reflecting this amended quantity. (Parrent Decl. at ¶ 11). The Bomin Confirmation contained an express instruction for Integr8 that "a copy of this confirmation shall be sent in its entirety by the broker to the Buyer." (DX-27, at BOMIN003154). Like the Bunker Nomination, the Bomin Confirmation referenced that the seller's standard terms and conditions

their governance of the transaction. (*See id.*, at BOMIN003153, "[t]his transaction will be governed by our General Conditions of Sale and Delivery"). The Bomin Confirmation stated that copies of these terms were "immediately available upon request, or via http://www.bomin.com/downloads[.]" (*Id.*, at BOMIN003154).

13.     Garza subsequently issued an Amended Bunker Nomination (the "Amended Bunker Nomination") to LMC with an "AMENDED QTTY RANGE" that specified a quantity range of "1,130 MT – 1,430 MT" for the RMG 380. (DX-21; Parrent Decl., ¶ 13). Page 2 of the Amended Bunker Nomination contained identical language to the first, stating that the bunker nomination was "NOMINATION ACCEPTED IN ACCORDANCE WITH SELLER'S STANDARD TERMS AND CONDITIONS" and directing the buyer to request a copy of if necessary. (*Id.*) Garza also forwarded a copy of Amended Bunker Nomination to Bomin. (DX-24; DX-60; Parrent Decl. at ¶ 13 ).

14.     The Amended Bunker Nomination, however, did not match the original inquiry (Parrent Decl. at ¶ 13), which called for 1,300 metric tons of RMG 380, plus or minus 10% (DX-3; DX-57), a range that works out to 1,170-1,430 MT. Bomin did not object to this new, third amended quantity range. (Parrent Decl. at ¶ 13).

## C.     *Delivery to the Vessel*

15.     On March 8, 2018, Bomin delivered 8,279.56 net barrels/1,302.54 metric tons of IFO-380 to the *M/V Liberty Peace* at the Port of Beaumont, Texas, by way of transfer from the bunker barge MGI 2332. (Nelson Decl. at ¶ 8). The IFO-380 destined for the *M/V Liberty Peace* aboard the MGI 2332 came from Bomin's inventory on Pelican Island, and was composed primarily of products sourced and delivered into Bomin's Pelican Island storage facility from Motiva Enterprises, LLC(McCormack Dec. , ExxonMobil, and Allied Petrochemical, LLC. (*Id.*).

16.     Consistent with regulatory requirements and Bomin's standard operating procedures, a Bunker Delivery Note ("BDN") containing information documenting the bunkering of the *M/V Liberty Peace* on March 8, 2018, along with a representative sample of the marine fuel, were provided to the vessel. (Nelson Decl. at ¶ 9). A BDN contractual sample was also retained consistent with *Bomin's General Conditions of Sale and Delivery effective from January 1, 2006*. (*Id.*).

17.     The *M/V Liberty Peace* loaded 436.9 metric tons of Bomin Heavy Fuel Oil RMG 380 into its #5 Inboard P tank which already held 7.2 metric tons of another Fuel Oil. (McCormack Decl. at ¶ 58). The Liberty Peace also loaded 858.9 metric tons into the #5 Inboard S tank which already held 9 metric tons. (*Id.*). The #5 Inboard P tank was filled with 98.35% Bomin Fuel and 1.65% (16,500 ppm) unknown fuel. (*Id.*). The #5 Inboard S tank was filled with 98.95% Bomin Fuel and 1.05% (10,500ppm) of unknown fuel. (*Id.*).

18.     Best practices would have been not to load another fuel on top of an existing fuel, in other words do not comingle fuels. (McCormack Decl. at ¶ 59). And no compatibility test was run on a mixture of the two (2) comingled fuels. (McCormack Decl. at ¶ 60).

19.     LMC had samples of the fuel analyzed by its vendor, Viswa Lab, which delivered an analysis to the LMC Engineering Department on March 20, 2018. (DX-43). The fuel analysis report stated the fuel was on-spec, but had slightly high density, and recommended "Reducing the fuel flow through the purifier by as much as 75%." (*Id.* at LIBA 00899). That same report also warned that "[p]oor purification will fail to remove impurities and catfines from fuel." (*Id.*)

20.     After Bomin supplied the M/V Liberty Peace with bunkers, the vessel sailed up the East Coast of the United States, calling at various ports, before proceeding on a voyage to the Middle East where, on April 24, 2018, it called upon the Port of Shuaiba, Kuwait, where the

Vessel took on board 1000 metric tons of additional IFO 380 fuel. (DX-150 at LIBA00070). April 24, 2018, was also the first date that the crew of the M/V Liberty Peace began burning the marine fuel Bomin had supplied in early March 2018. (DX-42).

**D.    *The Houston Problem***

15.    In early February 2018 Bomin personnel began hearing rumors that there were concerns about supplies of marine fuel oil in the Houston market, specifically with regard to Total Sediment Potential. (Nelson Decl. at ¶ 6). The rumor in the market at the time was that Flint Hills refinery was likely responsible. (*Id*.). Bomin was aware that the Vacuum Tower Bottoms (VTB), *i.e*., the leftover bottom product of crude oil separation in distillation towers, from Flint Hills was high in sediment. (*Id*). That sediment content, however, could be blended down below specification when blended with Flint Hills' Slurry Oil from its Fluid Catalytic Cracker (FCC). (*Id*.). Bomin purchased these products from Flint Hills in late January 2018 and instructed its terminal operator to blend the two streams without any issue arising. (*Id*.).

16.    In early March 2018 Bomin purchased another lot of oil from Flint Hills refinery. (Nelson Decl. at ¶ 7). The cargo was split again as 50% VTB and 50% Slurry. (*Id*.). Bomin experienced no issues blending the oil from Flint Hills refinery. (*Id*.)

17.    In mid-March 2018 Bomin began hearing about fuel quality claims in the Houston area. (Nelson Decl. at ¶ 7). Bomin initially believed these claims could be due to sediment quantity. (*Id*.). Accordingly, Bomin continued to monitor sediment levels of its product in March 2018. (Id*.).*

18.    On March 13, 2018, Bomin received its first notice of a claim from interested parties for the *M/V Toronto*. (Nelson Decl. at ¶ 10). Bomin inquired whether there had been any comingling of product onboard the vessel, because comingling or blending could potentially cause

a problem if the two streams of oil were incompatible, and Bomin believed initially that there could be a compatibility issue with other streams of product onboard the *M/V Toronto* that had not been supplied by Bomin.  (*Id.*).  Fuel sample analyses by the customer did not reveal any meaningful information to Bomin and Bomin conducted additional testing.  (Nelson Decl. at ¶ 11-15).  With no clear root cause of what became known in the bunker industry media as the Houston problem, Bomin continued to consult with industry resources to gather as much information on the issue that it could.  (Nelson Decl. at ¶ 17-19).

### E.  *Problems Reported Aboard the M/V Liberty Peace*

19.     After the crew of the *M/V Liberty Peace* began burning the Bomin supplied fuel on April 24, 2018, the frequency of the automatic shoot, which is self-cleaning, cycles of the fuel filters for the main engine ("ME") and diesel generators ("DG") began to increase.  By April 25, 2018, according to the vessel's Chief Engineer, use of the fuel led to an "[i]mmediate increase in frequency of Diesel Generator Back Flush Filter Shoots."  (DX-42).

20.     From April 24 through April 30, 2018, only a single fuel purifier, the No. 2 FO Purifier, was online.  (DX-156, at LIBA 000481-493).  The crew brought a second FO Purifier, the No. 1 purifier, online on April 30, 2018.  (*Id.* at LIBA 000493).

21.     Between January 19 and April 23, 2018, the generator fuel filters had averaged 11 and 12 automatic shoot cycles per day.  (Daly Decl. at ¶ 11, citing LIBA 000288-000480; DX-153 through DX-156).  By May 3, 2018, the Engine Log recorded automatic shoot cycles for the previous twenty-four hours for the ME and DG automatic fuel filters of 19 and 42 cycles respectively.  (Daly Decl. at ¶ 13, citing DX 157 at LIBA 000499).

22.     Later that day, the vessel experienced a disruption of electrical power, due to the failure of the No. 3 auxiliary engine at 1233 hours, as recorded by the Engine Room Alarm

records.  (DX 158 at LIBA 003432-33).  During this portion of the voyage, the Deck Logs note the Vessel was experiencing rough seas.  (*See, e.g.*, DX-151 at LIBA 000179).  On May 4, 2018, problems continued, with the Chief Engineer reporting an "[i]ssue with no. 3 Diesel Generator sticking racks because of carbon deposits."  (DX-42).

23.     On May 6, 2018, the vessel reached the Port of Aqaba, Jordan; the vessel drifted ashore while awaiting berth, and ultimately berthed May 11, 2019.  (DX-151 at LIBA 00183-187).

24.     While the vessel drifted near Aqaba, the number of automatic shoot cycles had increased further.  By May 9, 2018, the Engine Room Logbook documented 105 automatic shoot cycles for the DG automatic fuel filter.  (DX-157 at LIBA 000511).  Zero automatic shoot cycles were recorded for both the main engine and the auxiliary engine automatic fuel filters from noon on May 9 to noon on May 10, 2018, but no explanation for this is provided in the Vessel's record.  (*Id.* at LIBA 000511-513).  On that date, the Chief Engineer reported the prior failure of the No. 3 Diesel Generator to LMC's shoreside management.  (DX-42).

25.     On May 11, 2018, the vessel's crew bypassed the DG automatic fuel filter for cleaning at 0916 hours, and bypassed the ME automatic fuel filter for cleaning at 2303 hours. (*Id.* at LIBA 000515).

26.     Notably, between May 3, 2018, and May 12, 2018, the Vessel experienced numerous fuel supply and electrical generation issues, evidenced by the vessel's Engine Room Alarm Printouts.  (*See* DX-49 at LIBA 003434-3444, reporting a series of viscosity alarms, pressure alarms, start failures for the No. 1 and No. 2 Diesel Generators, power abnormalities, and exhaust deviations).

27.     On May 12, 2018, the vessel departed Aqaba, Jordan at 0330 hours (DX-151 at LIBA 000188), despite that: (i) numerous alarms that day had occurred regarding the No. 1 Diesel

Generator (DX-158 at LIBA 003445; DX-157 at LIBA 00517), (ii) the No. 3 Diesel Generator was out of service since May 3, 2018 (DX-42), and (iii) both the ME and DG automatic fuel filters were bypassed at the time of departure. (DX-157 at LIBA 00517). The vessel's departure was made amidst further rough seas. (DX-54).

28.     After departure, the DG automatic filter was brought back online at 0855 hours and the ME automatic filter was brought back online at 0904 hours. (DX-157 at LIBA 00517). However, the DG automatic filter rapidly clogged and was again bypassed at 1600 hours. (*Id.*).

29.     By 1718 hours, the Nos. 1 & 2 Diesel Generators failed, and the main engine shutdown. (DX-54). The engine alarm log indicates low fuel pressure to the No. 2 Diesel Generator, accompanied by a low bus voltage alarm for Diesel Generators Nos. 1 & 2 DG (DX-158 at LIBA 003446), which indicates that the DG automatic filter's bypass filter had clogged, causing low fuel pressure to the generator, resulting in a blackout and loss of propulsion, at approximately 1717 hours. (Daly Decl. at ¶ 23).

30.     In a subsequent statement, the vessel's Chief Engineer reported that despite "[c]leaning of the Diesel Generator Bach [sic] Flush Filter" a "Dead ship" situation resulted on May 12, 2018. (DX-42).

31.     After loss of power, propulsion and control, the vessel was towed to by tug to the Port of Suez for inspection and repairs. (Verified Compl., ¶¶ 8-9).

> **F.     *Bomin Receives a Notice of Claim from the M/V Liberty Peace's Interests***

32.     On May 17, 2018, Chris Turner of Integr8 Fuels Inc., acting "AS BROKER ONLY" advised Mike Parrent that it had received notification of a quality claim regarding the M/*V Liberty Peace*, and placed Bomin "on notice for any / all costs, damages and/ or penalties that may occur as a result of this claim." (DX-22). Turner's communication alleged that the Vessel "experienced

multiple engine casualties while consuming the Bomin-supplied fuel." (*Id.*).

33.    On May 17, 2018, Vincent Terracciano, the Manager of Bomin's Sales and Marketing Groups, replied to Turner.  Terracciano directed Turner to Article 8 of Bomin's General Conditions, noting "[t]he vessel was supplied on March 8th yet this is the first time we have been notified of any issues with the consumption of thefuel [sic]."  (DX-23).  Citing the General Conditions, Terracciano then stated that "Bomin's claim period is 14 days from the date of delivery" and "[a]s such … this claim is time barred."  (*Id.*; *see also* DX-65 and Terracciano Decl. at ¶ 8).

34.    The *M/V Liberty Peace* returned to the U.S. Gulf Coast in June 2018 and, as it had done with the first fuel quality claim it had received from the *M/V Toronto*, Bomin sought to mitigate damages and manage risk by de-bunkering the remaining Bomin-supplied IFO-380 aboard the vessel and repurchasing the fuel at the same cost as it had been supplied.  Under Bomin's General Conditions, this represented Bomin's maximum liability for the alleged off-specification fuel, *i.e.*, the price of the fuel under the contract.  (Terracciano Decl. at ¶ 9).

### G.    *Liberty Initiates this Lawsuit*

35.    Liberty filed its Verified Complaint in this Court on April 30, 2019, against Bomin seeking damages in the amount of USD 1,188,994.23, including costs of repairs, towage, spare parts, and lost earnings.  (Nelson Decl. at ¶ 26).

### H.    *The Parties Test the Contractual Sample*

36.    The Parties entered into an October 22, 2019, Joint Agreed Protocol to govern joint testing of the contractual BDN sample of the fuel.  (DX-209).  A witnessed analysis of the contractual BDN sample and a sample produced by Liberty by GC-MS and FTIR was conducted by Intertek Caleb-Brett's Sunbury laboratory on November 11-12, 2019.  (Nelson Decl. at ¶ 28).

Nelson Decl. at ¶ 28). Intertek (Sunbury) memorialized its findings in a joint report dated December 12, 2019. (DX-173). Contrary to establishing contamination, its GC-MS testing yielded no clear evidence for the presence of non-petroleum components in the fuel, and Fourier Transform Infrared testing showed only *de minimis* levels of carbonyl-containing components. (DX-173; Nelson Decl. at ¶ 28).

37. The Court finds that the Parties entered into a written (not verbal) contract for the Bomin-supplied marine fuel stemmed to the *M/V Liberty Peace* on March 8, 2018, and that the contract clearly incorporated Bomin's industry-standard General Conditions, including its limitation of liability which preclude Plaintiff's consequential damages claim (as well as its tort claim). (Sec. B., *supra*, at ¶¶ 6-14).

38. The Court recognizes Therese Ignozzi-Little as an expert in the area of custom and usage of the trade, industry fundamentals, standard practices and procedures, and operations in the marine fuel (bunker) industry, to include negotiation for and procurement of marine fuel (bunkers), pursuant to FED. R. EVID. 702.

39. The Court finds that it is the custom and normal practice in the marine fuel industry that a seller's standard terms and conditions become a part of the contract for the sale of marine fuel unless objected to by the buyer. (Ignozzi-Little Decl. at ¶ 18).

40. The Court finds further that Bomin's General Conditions bar the claims asserted by Liberty in this lawsuit. (DX 26 at Art. 14).

41. The Court recognizes Chief Engineer John Daly as an expert in the area of safety management, industry fundamentals, and "best practices" in the commercial shipping industry from a marine engineering standpoint, to include standard practices, procedures, operations, and regulatory requirements as regards supervision, maintenance, loss control procedures, and accident

prevention/reduction, pursuant to FED. R. EVID. 702. The Court affords the opinions of Chief Engineer Daly great weight.

42.     The Court finds the disruption of electrical power and losses of propulsion on May 3 and May 12, 2018, aboard the *M/V Liberty Peace* "can be attributed to the improper onboard fuel handling and treatment" of the vessel's crew, and the crew's "failure to follow the recommendations provided in the fuel analysis report for this fuel." (Daly Decl. at ¶ 25).

43.     The Court finds further that the crew of the *M/V Liberty Peace* failed to properly handle and treat the Bomin-supplied fuel. By the time the second purifier was brought online, the throughput rate stood at 5400 liters per hour, in violation of Viswa Labs', Liberty's vendor's, recommendations and the posted limits on the Liberty Peace. (Daly Decl. at ¶¶ 30-35). This was also far in excess of what standard marine practice would have dictated, which as stated by Chief Engineer Daly would be a throughput rate of approximately 1500 liters per hour to ensure the most efficient purification possible. (*Id.*). Additionally, the catfine level of the Beaumont fuel (*Id.* at ¶ 43), would not have caused operational difficulties or engine wear had the fuel been properly purified and treated onboard by the vessel's crew. (Daly Decl. at ¶ 50).

44.     The Court finds that the increase of automatic cleaning cycles in the DG and ME automatic fuel filters also indicates that the fuel was not properly treated and purified. (Daly Decl. at ¶¶ 67-81). Additionally, the rough seas experienced by the vessel could have contributed to an increase in impurities in the fuel as rough seas agitate fuel tanks, causing impurities that have settled in the tanks to become mixed into the fuel supply. (Daly Decl. at ¶ 72). Notably, the excessive number of cleaning cycles continued even *after* consumption of the Beaumont fuel ceased. (*Id.* at 74).

45.     The Court recognizes Gregory M. McCormack as an expert in the area chemical

engineering and fuel chemistry, crude oil production, complex refinery processes, to include marine fuel oil refining processes, testing methods, procedures, and parameters for Heavy Fuel Oil (HFO), pursuant to FED. R. EVID. 702. The Court finds that Mr. McCormack is an extremely able and fair witness, and his testimony was of the highest order.

46.     The Court finds that the marine fuel supplied by Bomin to the *M/V Liberty Peace* on March 8, 2018, complied in all respects with the required contractual specifications of ISO 8217:2010.  (DX 201; McCormack Decl. at  ¶ 7).

47.     The Court finds further that those components in the fuel later identified through Gas Chromatograph Mass Spectrometer ("GC-MS") testing (itself a non-standard test) identified only a minor concentration of chemicals in the parts per million range (McCormack Decl. at  ¶¶ 8-10, 12, 19), and that those components (i) likely originated in the crude oil, not the refining process, due to chemicals used in the shale fracking oil extraction process (*Id.* at  ¶¶ 11, 18); and (ii) those chemicals would not have been detrimental to the machinery of the vessel (*Id.* at  ¶ 19).

48.     Accordingly, the Court finds that Liberty failed to carry its burden of establishing that the Bomin-supplied fuel was contaminated and causation.

49.     The Court recognizes Captain Paul M. Foran, a Master Mariner, as an expert in the area of vessel operations and vessel management, safety management, industry fundamentals, and "best practices" in the commercial shipping industry involving ocean-going vessels, pursuant to FED. R. EVID. 702. The Court affords the opinions of Chief Engineer Daly great weight.

50.     The Court finds that the *M/V Liberty Peace* crew's decision  to leave Aqaba without the bow thruster and with impaired maneuverability "was imprudent and was not in accordance with industry best practice, or good seamanship.  (Foran Decl. at ¶ 55).

51.     The Court finds that the vessel left port without sufficient spare parts, particularly

since the failure of the No. 3 Diesel Generator depleted onboard equipment and deprived the vessel of its "ability to conduct any maintenance and repair, planned or emergency[.]" (Daly Decl. at ¶ 17).

52.     The Court finds further that the vessel *should not have left a safe harbor*, and instead should have conducted reliable repairs to all three Diesel Generators, ensured effective treatment of the fuel supply, and taken on a proper complement of spare parts (Daly Decl. at ¶ 119; Foran Decl. at ¶ 22). The decision to leave the port with the availability of all generators was "not in accordance with industry best practice" and was not "reasonably prudent," particularly as the ongoing mechanical issues were clear indicators that the vessel was "unseaworthy." (Foran Decl. at ¶¶ 16, 22).

53.     The Court finds that it was the choice to leave a safe harbor, without completing repairs and necessary equipment, that "ultimately led to the vessel losing power and drifting" on May 12, 2018. (Foran Decl. at ¶ 18). LMC shoreside management compounded this error by failing to exercise proper oversight over the vessel, and failing to direct the vessel's crew to remain in Aqaba until repairs were completed. (Foran Decl. at ¶ 30). The decision to leave safe harbor was particularly notable and imprudent given that the Vessel was transiting through dangerous waters, waters replete with heavy traffic, choke points, and heavy pirate activity, which required increased diligence. (Foran Decl., ¶¶ 19-22, 27-28).

## II.     PROPOSED CONCLUSIONS OF LAW

1.     This is an admiralty and maritime action within the meaning of Rule 9(h) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. Therefore, this Court has jurisdiction over this action under 28 U.S.C. § 1333. Venue in the Southern District of New York is proper under 28 U.S.C. § 1391.

2.     "The burden of proof in admiralty cases is on the Plaintiff to show that the Defendant was negligent and that such negligence was the proximate cause of Plaintiff's damages." *Valentine v. U.S.*, 630 F. Supp. 1126, 1132 (S.D. Fla. 1986) (citing *Higginbotham v. Mobil Oil*, 545 F.2d 422, 427 (5th Cir. 1977), *rev'd on other grounds*, 436 U.S. 618 (1978)).

3.     A breach of contract claim is an admiralty claim if the contract on which the suit is based is a maritime contract. *Gulf Coast Shell & Aggregate LP v. Newlin*, 623 F.3d 235, 240 (5th Cir. 2010).

4.     It is well-established that bunker supply contracts are maritime in nature. *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 612 (1991).

5.     In maritime transactions, the Uniform Commercial Code ("UCC") is regarded as a source both for admiralty and federal common law. *Clem Perrin Marine Towing, Inc. v. Panama Canal Company*, 730 F.2d 186, 189 (5th Cir. 1984); *see also Southworth Machinery Co. v. F/V Corey Pride*, 994 F.2d 37, 41 (1st Cir. 1993) (UCC is the controlling law for federal admiralty law); *Sun Oil Co. of Penn. v. M/T Carlisle*, 771 F.2d 805, 811-12 (3rd Cir. 1985). The UCC controls Liberty's breach of contract claims in this case.

6.     In this case, the written email exchanges between Mike Parent for Bomin and Aaron Garza acting on behalf of Liberty resulted in a valid, written contract for the supply of marine fuel to the *M/V Liberty Peace*. *See European School of Economics Foundation et al., v. Teknoloji Holdings, A.S.*, 2011 U.S. Dist. LEXIS 47691, *15 (S.D.N.Y. May 4, 2011) (various e-mail communications sufficient to establish the parties recognized a basic agreement and constitute a written contract); *Empro Sys. v. Namasco Corp.*, 382 F. Supp. 2d 874, 880-881 (S.D. Tex. 2005) (purchase order and confirmation sufficient to establish a contract for sale under U.C.C.).

7.     The power of acceptance lay with Bomin, who accepted LMC's offer to purchase fuel when it confirmed its willingness to enter into the transaction and actually delivered the fuel. *See Menendez v. Faber Coe & Gregg, Inc*., 345 F. Supp. 527, 563 (S.D.N.Y. 1972) (modified by 485 F.2d 1355) (seller's acceptance of an offer occurs when goods are delivered); *Brochsteins, Inc. v. Whittaker Corp*., 791 F. Supp. 660 (S.D. Tex. 1992) (seller's agreement to fill purchase order operates as acceptance of the buyer's offer).

8.     Section 2-207 of the Uniform Commercial Code governs contracts for sale between merchants, and provides in relevant part that, a "seasonable expression of acceptance or a written confirmation operates as an acceptance even though it states terms additional to or different from those offered or agreed upon" and those terms are "construed as proposal for additional to the contract" that "between merchants … become part of the contract" unless, as potentially applicable here, they "materially alter it" or the counter party objections to them.  N.Y. C.L.S. U.C.C. § 2-207(1)-(2) and TEX. BUS.& COMM. CODE § 2.207(a)-(b).

9.     In this case, there is no dispute that Liberty did not object to the inclusion of Bomin's General Conditions.  Instead, Liberty was (i) repeatedly notified that the transaction was subject to Bomin's General Conditions, (ii) had every opportunity to request Bomin's General Conditions and object to them, and (iii) failed to do so.  Liberty cannot now contest their inclusion. *See Lion Copolymer, LLC v. Kolmar Americas, Inc.*, 147 A.D.3d 586 (N.Y. App. Div. 1st Dep't 2017) (Terms and Conditions included with Transaction Confirmation became part of contract where plaintiff failed to object to their inclusion); *Morales Elec. Contracting, Inc. v. Siemens Building Technologies, Inc.*, 2012 WL 1038865 (E.D.N.Y. 2012) (Terms and Conditions identified in instrument incorporated by reference into contract, even though the Terms and Conditions were not attached to the parties' writings, where plaintiff failed to object to them); *Nirvana*

*International, Inc. v. ADT Sec. Services, Inc*., 525 Fed. Appx. 12, 15 (S.D.N.Y. 2013) (limitations contained in Terms and Conditions binding where party opposing them expressed no objection to them, and permitted other party to perform under the contract, "effectively capitulat[ing] to them"); *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc*., 687 F. Supp. 820 (S.D.N.Y. 1988) (terms and conditions referenced on acknowledgement form became part of contract where opposing party failed to object to them)' *In re Kyocera Wireless Corp.*, 162 S.W.3d 758 (Tex. App. 2005) (terms and conditions set forth in written confirmation became binding where receiving party never objected to them).

10.     Section 2.601 of the Uniform Commercial Code states that "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (1) reject the whole; or (2) accept the whole; or (3) accept any commercial unit or units and reject the rest. TEX. BUS. & COM. CODE § 2.601. "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." *Id.* at § 2.602(a). Acceptance of goods occurs when a buyer has had "a reasonable opportunity to inspect the goods [and] signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity." *Id*. at § 2.606(a)(1). And "[a]cceptance of a part of any commercial unit is acceptance of that entire unit. *Id*. at § 2.606(b). Finally, "[p]ayment against documents made without reservation of rights precludes recovery of the payment for defects apparent in the documents. *Id.* at § 2.605(b).

16.     Liberty had the option of accepting, rejecting or accepting in part and rejecting in part the Bomin-supplied fuel. The facts clearly support that all of the RMG 380 delivered to that vessel. This is evidenced by the signature of the Chief Engineer of the *M/V Liberty Peace* on Bomin's BDN

delivery receipt and by Bomin's receipt of payment in full for all of the marine fuel it supplied to the vessel.

17.     Once a buyer accepts goods and can no longer revoke that acceptance, he no longer has any claim for breach of contract, but is rather limited to warranty claims. *United Galvanizing, Inc. v. Imperial Zinc Corp.*, 2011 WL 11185 (S.D. Tex. Jan. 3, 2011) (Rosenthal, J.) (citing *Trident Steel Corp. v. The Wiser Oil Co.*, 223 S.W.3d 520, 526 (Tex. App.—Amarillo 2006, pet. denied) ("[I]t is the buyer's acceptance or rejection of goods [that] determines the remedies available to the buyer, not the seller's mere delivery of something")).

18.     But even those warranty claims are precluded by Article 14 of Bomin's General Conditions. Article 14 both precludes the claims Liberty has asserted in this lawsuit, along with the consequential damages it seeks to recover. *See, e.g.*, *Austin v. Servac Shipping line*, 794 F.2d 941,947 (5th Cir. 1986) (repair costs, port fees, inspections, additional insurance and transportation costs, crew wages, and replacement parts, and damages arising from loss of use of the vessel and delay and describing such damages as consequential); *Trump Int'l Hotel v. Carrier Corp.*, 524 F. Supp. 2d 302 (S.D.N.Y. 2007) (costs of repair and damages for loss of use are consequential in nature).

19.     Moreover, Article 14 of Bomin's General Conditions contains a limited remedy that Liberty has already had, *i.e.*, the de-bunkering and buyback by Bomin of the marine fuel at issue. Even if Bomin's General Conditions did not serve as a bar to Liberty's recovery, it would still take nothing on its claims.

20.     Liberty has the burden of establishing the unsuitability of Bomin's marine fuel and causation. *See Antilles Shipping Co. v. Texaco, Inc.*, 321 F. Supp

166, 167 (S.D.N.Y. 1970). This burden includes establishing what component of Bomin's fuel was responsible for Liberty's damages. *Id.* at 171. Finally, Liberty must show that it used Bomin's marine fuel properly. *Id.* at 167. It can do none of these things.

21. The good and credible evidence in this case establishes that the Bomin-supplied fuel met all contractual specifications of ISO 8217:2010, the governing standard. As such, Bomin had no obligation to warn Liberty about on-specification fuel or yet-to-come claims that did not arise until months after the Bomin-supplied fuel was stemmed to the *M/V Liberty Peace*. Likewise, Bomin had no duty to save Liberty from itself. "Absent a legal duty, a cause of action for negligence must necessarily fail." *Miller-Schmidt v. Gastech*, 864 F.2d 1181, 1184 (5th Cir. 1989).

22. Moreover, the general maritime law recognizes the doctrine of superseding cause. *See Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646, 652 (5th Cir. 1992). Accordingly, no actionable negligence claim against Bomin exists if the conduct and actions of another party prevented the actions of Bomin from serving as the legal cause of Liberty's alleged injuries and damages. In this case, the Court concludes that the responsibility for Liberty's damages lay with its vessel crew and shoreside management in (i) failing to properly handle and treat the Bomin-supplied fuel aboard the vessel, (iii) in failing to maintain necessary parts and spares aboard the vessel to navigate safely, (iv) in leaving a safe berth and port in an unseaworthy condition, (v) in failing to utilize available, alternative fuel already aboard the vessel, and (vi) in failing to properly manage the vessel and assure its timely maintenance and repair so as to mitigate its own damages.

23.     The Court concludes that Bomin's actions in this case at all times conformed to the applicable standards and were not the proximate cause of any injuries or damages allegedly sustained by Liberty. Therefore, Bomin cannot be liable to Liberty under any negligence theory.

24.      To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

25.     For the reasons set out in the Court's Findings of Fact and Conclusions of Law, and pursuant to Rule 58 of the Federal Rules of Civil Procedure, Judgment is hereby entered that Plaintiff take nothing of and from Defendant.

 IT IS SO ORDERED.

DONE at New York, New York this _____ day of _____, 2021.

_____
HON. PAUL A. ENGELMAYER
UNITED STATES DISTRICT JUDGE

Respectfully submitted,

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

/s/  Frederick W. Reif
Frederick W. Reif
Nathan T. Horst
150 E 42nd Street
New York, NY 10017
(212) 490-3000 – Telephone
(212) 490-3038 – Facsimile

frederick.reif@wilsonelser.com
nathan.horst@wilsonelser.com

Kevin T. Dossett, admitted *pro hac vice*
909 Fannin Street #3300
Houston, TX 77010
(713) 353-2000 – Telephone
(713) 785-7780 – Facsimile
kevin.dossett@wilsonelser.com

*Attorneys for Defendant Bomin Bunker Oil Corp.*

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the Bomin Bunker Oil Corporation's Proposed Findings of Fact and Conclusions of Law on Plaintiff, Liberty Global Logistics LLC, and its counsel via the Court's ECF electronic filing system, and as indicated below, on this 24th day of September, 2021.

*Via Email: TPrieto@cardillocorbett.com*
Tulio R. Prieto
Cardillo & Corbett
145 Hudson Street, Suite 5C
New York, NY 10013

*Via Email: JKleiner@hillbetts.com*
*Via Email: AWernicke@hillbetts.com*
James D. Kleiner
Adam M. Wernicke
Hill, Betts & Nash, LLP
14 Wall Street, Suite 5H
New York, NY 10005

 */S/ Frederick W. Reif* 
FREDERICK W. REIF