IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------- x
                                           :
LIBERTY GLOBAL LOGISTICS LLC,              :
                                           :
                       Plaintiff,          :        ECF Case
                                           :
       -against-                           :        Case No: 19-cv-03842-PAE
                                           :
BOMIN BUNKER OIL CORP.,                     :
                                           :
                       Defendant.          :
                                           :
----------------------------------------------------------- x
```

**DEFENDANT BOMIN BUNKER OIL CORP.'S
PRE-TRIAL MEMORANDUM OF LAW**

WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP

Frederick Reif & Nathan Horst
150 East 42nd Street
New York, NY 10017
(212) 490-3000
frederick.reif@wilsonelser.com
nathan.horst@wilsonelser.com

Kevin Dossett, *admitted pro hac vice*
909 Fannin St, No. 3300
Houston, TX 77010
(713) 353-2000
kevin.dossett@wilsonelser.com

*Attorneys for Defendant Bomin Bunker Oil Corp.*

259316679v.1

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

     I.       The Parties and the Vessel ...................................................................................... 2

     II.     The Bunker Fuel Transaction.................................................................................. 2

     III.    Bomin's General Conditions of Sale and Delivery (the "General Conditions") .......................................................................................................... 5

     IV.    The Bunkering and Voyage of the M/V Liberty Peace ........................................... 7

     V.     Mechanical Problems on Board the Vessel Develop ............................................... 8

     VI.    The Crew of the Vessel and Plaintiff's Management Failed to Take Prudent Action.................................................................................................................... 11

     VII.   Notification of the Claim ...................................................................................... 13

     VIII.  Plaintiff's Claim for Damages .............................................................................. 14

ARGUMENT .............................................................................................................................. 15

     I.       The Parties Entered into a Written Contract Foreclosing Plaintiff's Damages Claim .................................................................................................... 15

           A.      The Parties Did Not Enter into a Verbal Contract ................................... 15

           B.      The Parties Entered into a Written Agreement that Incorporated Bomin's General Conditions.................................................................... 17

           C.      Terms and Conditions Bar Plaintiff's Claims for Consequential Damages................................................................................................... 21

     II.     Plaintiff Failed to Carry Its Burden of Proof ....................................................... 22

     III.    Plaintiff Failed to Mitigate, and In Fact Caused, Its Own Damages ................... 24

           A.      Applicable Law Would Bar Recovery Here ............................................. 25

           B.      The Factual Record Is Replete with Conduct by Plaintiff Causing, or at the Very Least Failing to Mitigate, Their Damages ........................ 26

      C.      Plaintiff Ultimately Caused Its Own Harm..................................................31

CONCLUSION......................................................................................................................31

259316679v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*,
  282 F.3d 92 (S.D.N.Y. 2002)..................................................................................................19

*Am. Mech. Solutions, L.L.C. v. Northland Process Piping, Inc.*,
  184 F. Supp. 3d 1030 (D.N.Mx. 2016) ..................................................................................22

*Andrew v. Dial Corp.*,
  143 F. Supp. 522 (W.D.Tex. 2015).........................................................................................22

*Antilles Shipping Co. v. Texaco, Inc.*,
  321 F. Supp. 166 (S.D.N.Y. 1970) .........................................................................................22

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*,
  215 F.3d 219 (2d Cir. 2000)....................................................................................................19

*Bellvue South Assoc. v. HRH Constr. Corp.*,
  78 N.Y.2d 282 (N.Y. 1991) ....................................................................................................25

*Berkson v. Gorgo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) ......................................................................................18

*Brochsteins, Inc. v. Whittaker Corp.*,
  791 F. Supp. 660 (S.D.Tex. 1992) ..........................................................................................18

*East River Steamship Corp. v. Transamerica Delawal, Inc.*,
  476 U.S. 858 (1986)................................................................................................................15

*Empro Sys. v. Namasco Corp.*,
  382 F. Supp. 2d 874 (S.D.Tex. 2005) .....................................................................................15

*European School of Economics Foundation et al., v. Teknoloji Holdings, A.S.*,
  2011 U.S. Dist. LEXIS 47691 (S.D.N.Y. May 4, 2011).........................................................15

*Excel Fortress Ltd. v. Wilhelm*,
  2020 U.S. Dist. LEXIS 49706 (D. Ariz. Mar. 23, 2020) ........................................................22

*Federal Ins. Co. v. Sabine Towing & Transp. Co.*,
  783 F. 2d 347 (2d. Cir. 1986)..................................................................................................25

*Gold v. Deutsche Aktiengesellschaft*,
  365 F.3d 144 (2d Cir. 2004)....................................................................................................19

iii

*Hygeia Diary Co. v Gonzalez*,
   994 S.W.2d 220 (Tex. App. 1999) ................................................................................25

*Invista N. Am. S.À.R.L. v. M&G USA Corp.*,
   951 F. Supp. 626 (D.De. 2013) ....................................................................................22

*J.D. Fields & Co., Inc. v. U.S. Steel Int'l, Inc.*,
   426 Fed. Appx. 271 (5th Cir. 2011) ............................................................................17

*In re Kyocera Wireless Corp.*,
   162 S.W.3d 758 (Tex. App. 2005) ...............................................................................21

*Lion Copolymer, LLC v. Kolmar Americas, Inc.*,
   147 A.D.3d 586 (N.Y. App. Div. 1st Dep't 2017) .......................................................20

*Litton Microwave Cooking Prods. V. Leviton Mfg. Co., Inc.*,
   15 F.3d 790 (8th Cir. 1994) .........................................................................................17

*M/T King Dorian Tankschiffarts GmbH & Co. v. Anchor Marine & Industrial Supply, Inc.*,
   2018 WL 8732184 (S.D.Tex. Nov. 30, 2018) ..............................................................15

*Maverick Int'l, Ltd. v. Occidental Mukhaizna LLC*,
   2011 U.S. Dist. LEXIS 160199 (E.D.Tex. Mar. 1, 2011) ............................................17

*Menendez v. Faber Coe & Gregg, Inc.*,
   345 F. Supp. 527 (S.D.N.Y. 1972) (modified by 485 F.2d 1355) ...............................18

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   387 F. Supp. 3d 323 (S.D.N.Y. 2019) .........................................................................22

*Morales Elec. Contracting, Inc. v. Siemens Building Technologies, Inc.*,
   2012 WL 1038865 (E.D.N.Y. 2012) ...........................................................................20

*Nirvana International, Inc. v. ADT Sec. Services, Inc.*,
   525 Fed. Appx. 12 (S.D.N.Y. 2013) ............................................................................21

*Oceanconnect.com, Inc. v. Chemoil Corp.*,
   2008 WL 194360 (S.D.Tex. Jan. 23, 2008) .................................................................22

*Pulaski Bank & Trust Co. v. Texas Am. Bank/Fort Worth, N.A.*,
   759 S.W.2d 723 (Tex. App 1988) ................................................................................25

*Qualls v. State Farm Lloyds*,
   226 F.R.D. 551 (N.D.Tex. 2005) .................................................................................22

*Rainier Southlake DST v. Woodbury Strategic Partners Fund, LP*,
   2017 Tex. App. LEXIS 11407 (Tex. App. Dec. 7, 2017) ..............................................17

iv

*Rhenalu v. Alcoa, Inc.*,
   224 F. Supp. 2d 773 (D.De. 2002) ........................................................................17

*Smith v. Mitlof*,
   148 F. Supp. 23d 279, 285 (S.D.N.Y. 2001) .......................................................15

*St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc*.,
   687 F. Supp. 820 (S.D.N.Y. 1988) ......................................................................21

*Tosco Corp. v. Oxygenated Marking and Trading A.G.*,
   1999 WL 328342 (S.D.N.Y. May 24, 1999) .......................................................20

*Trell v. American Ass'n of Advancement of Science*,
   2007 WL 1500497 (W.D.N.Y. 2007) ...................................................................17

*Trump Int'l Hotel v. Carrier Corp.*,
   524 F. Supp. 2d 302 (S.D.N.Y. 2007) .................................................................21

*U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.*,
   205 F. Supp. 3d 386 (S.D.N.Y. 2016) .................................................................22

*U.S. Bank National Association v. Ables & Hall Builders*,
   696 F. Supp. 2d 428 (S.D.N.Y. 2010) .................................................................25

**Statutes**

U.C.C. ................................................................................................................ passim

U.C.C. Code § 2.207(a)-(b) .............................................................................................18

U.C.C. § 2-207 .............................................................................................16, 18, 19

U.C.C. § 2-207(1)-(2) ......................................................................................................21

**Other Authorities**

*Bomin International Group of Companies General Conditions of Sale and
   Delivery effective from January 1, 2006*, BOMIN.COM,
   https://www.bomin.com/fileadmin/content/global_content/downloads/bomin-
   matrix/Bomin- .......................................................................................................... 5-6

v

## PRELIMINARY STATEMENT

This is an admiralty action by which Plaintiff Liberty Global Logistics LLC ("Liberty Global") asserts claims against Defendant Bomin Bunker Oil Corporation ("Bomin"), contending that Bomin provided "off-spec" contaminated fuel resulting in damage to the *M/V Liberty Peace* (the "Vessel").  Bomin hereby submits this Memorandum of Law pursuant to Part 5(B)(ii) of the Court's Individual Rules and Practices in Civil Cases in order to address questions of law that will arise at the upcoming trial in this action and supplement its proposed findings of fact and conclusions of law.  Specifically, this Memorandum of Law contends that applicable law and facts in the record will prove the following at trial.

*First*, that the parties entered into a written contract for the sale of the bunker fuel, one that incorporated Bomin's General Conditions of Sale and Delivery.  These General Conditions contained limitation of liability provisions that bar Plaintiff's claims for consequential damages for allege damage to the Vessel.  (*See* Argument, Part I, *infra*).

*Second*, Plaintiff's bore the burden of proof in this action to prove that the bunker fuel was contaminated and caused damages to the Vessel.  However, Plaintiff offered no such proof, failing to provide competent evidence of contamination, and instead proffered only an unqualified expert.  Indeed, the only qualified expert to present evidence in the case concluded there was no contamination that caused the Vessel's damages.  (*See* Argument, Part II, *infra*).

*Third*, it is clear that Plaintiff caused its own damages through a series of poor decisions, including (i) improper handling and purification of the subject fuel; (ii) failure to maintain critical parts and equipment; and (iii) leaving a safe port with compromised systems and capabilities without investigation and repair of the Vessel's ongoing and obvious operational difficulties. (*See* Argument, Part II, *infra*).

1

## STATEMENT OF FACTS[1]

### I.      The Parties and the Vessel

1.      Plaintiff Liberty is Delaware company (Verified Compl., ¶  2), which is in possession and control of the Vessel through a Bareboat Charter dated August 14, 2017 by and between Plaintiff and owner trustee Wilmington Trust Company (DX-206).

2.      Plaintiff is party to a Vessel Operating and Management Agreement with Liberty Maritime Corporation ("Liberty Maritime") (DX-207), and Liberty Maritime acts as the vessel manager and technical manager for the Vessel.  (Deposition of Theodore S. Makrinos at 16:2-15).

3.      Defendant Bomin is a physical supplier of marine fuel bunkers, with operations in Houston and other ports across the Gulf Coast of the Unites States.  (Nelson Decl., ¶ 4).

### II.      The Bunker Fuel Transaction

4.      On February 28, 2018, Efthimios Vassilas of Liberty Maritime reached out to Aaron Garza, requesting "firm brokered pricing" for 1,300 metric tons, plus or minus 10 percent, of Heavy Fuel Oil "HFO" RMG 380 fuel and 300 metric tons of Low Sulphur Marine Gas Oil "LSMGO" fuel.  (DX-3; DX-57). Aaron Garza was a broker with Integr8 fuels.  (Deposition of Aaron Garza at 16:1-12).

5.      At 9:39 AM CST,[2] Garza reached out to various suppliers through a blind copy e-mail, with Michael Parrent of Bomin among the recipients, requesting the suppliers "Pls quote for

---

[1]      Following Statement of facts is drawn from Defendant's accompanying Exhibits (cited hereinafter as "DX-__"), as well as the Direct Testimony Declarations of Christopher Nelson, dated September 22, 2021 ("Nelson Decl."); Michael T. Parrent, dated September 23, 2021 ("Parrent Decl."); Vincent Terracciano, dated September 24, 2021 ("Terracciano Decl."); Therese Ignozzi-Little, dated September 17, 2021 ("Ignozzi-Little Decl."); John Daly, dated September 21, 2021 ("Daly Decl."); Paul S. Foran, dated September 22, 2021 ("Foran Decl."); and Gregory M. McCormack, dated September 20, 2021 ("McCormack Decl.").

[2]      The times listed in this Statement of Facts are rendered into CST, the timezone in which Integr8 and Bomin were operating at the time of the transaction.  As set forth in the parties'

2

Liverty [sic] Maritime."  (DX-5; DX-29).  At 9:54 AM CST, Parent responded to Garza with a quote of $351 per metric ton of HFO RMG 380, and $582 per metric ton of LSMGO.  (DX-5).[3] Garza presented Vassilas with quotes received from supplier Vitol, also informing him that Bomin potentially could be induced to make a more competitive bid.  (DX-6).  However, Vassilas did not pursue the presented offer, telling Garza "Lets [sic] revisit tomorrow" and citing a "basis change in the market."  (DX-7).

6.      The next day, on March 1, 2018, at 7:37 AM CST, Garza informed Parrent that the vessel's "Owners advis[e] [that] they will revisit this around 11 AM today.  Will be back when they want us to go out firm." (DX-8; DX-34).  At 10:35 AM CST, Vassilas reached out to Garza, "Please quote firm as per initial msg[,]" with Garza acknowledging.  (DX-9; DX-11).

7.      At 10:36 AM CST, Garza reached out to Parrent, "Lets quote again pls.  Liberty asking for firm quotes now."  (DX-10; DX-35).  At 10:42 AM CST, Parrent issued a quote of "$337/570 MTW" which baked in an industry-custom $1 per metric ton commission for Integr8. (DX-12; DX-36; Parrent Decl., ¶ 5).

8.       Garza relayed the quote to Vassilas at 11:13 AM CST.  (DX-13).  In response, at 11:18 AM CST, Vassilas asked Garza to "Counter the MGO at 565."  (DX-15).  However, at that same time, Garza relayed to Vassilas that "Bomin said the market had popped and needs to amend

---

Stipulation at section vii(a)(i) of the Pretrial Order, the parties recognize that documents produced by Integr8 were produced in EST, with one hour difference from CST, and documents produced by Bomin were produced in UTC, five hours ahead of EST and six hours in difference from CST. For clarity, the EST and UTC times listed on these e-mails have been translated to CST for this Statement of Facts.

[3]      Other brokers, such as LQM Petroleum Services, LLC, had been contacted by Vassilas and relayed the request for quotes to Bomin (DX-31); however, Bomin did not provide a quote to these brokers and only responded to Integr8 and Aaron Garza, who had brought the request to them first. (DX-30; DX-32; DX-33).

3

price to … $340//573[.]" (DX-14; *see also* Parrent Decl., ¶ 5, noting there was an "interim change in market conditions" requiring a change in price).

9.     At 11:23 AM CST, Garza confirmed an acceptable prince of "$338//$571 mtw + Barging [costs]" with Vassilas, who acknowledged and thanked him at 12:43 PM CST.  (DX-16; DX-18).  At 11:24 AM CST, Garza relayed that price confirmation to Parrent, stating "Formals to follow."  (DX-17; DX-37; Parrent Decl., ¶ 9).

10.     At 12:16 PM CST, Nancy Awadallah, Assistant Purchasing Manager of Liberty Maritime Corporation, issued a Purchase Order (number PEAC0036944) for the fuel, in the total amount of $635,475.  (DX-19; DX-63).

11.     At 12:17 PM CST, Integr8 issued a confirmation document for the Bunker Transaction to Vassilas and Liberty Maritime, reflecting agreement to a price term of $338 per metric ton for the HFO RMG 380 fuel and a price of $571 per metric ton for the LSMGO fuel. (DX-20) (the "Integr8 Confirmation").  On page 2, the Integr8 Confirmation stated:

> * THIS NOMINATION IS BEING SENT TO BOTH THE BUYER AND
> THE SELLER.
> * NOMINATION ACCEPTED IN ACCORDANCE WITH SELLER'S
> STANDARD TERMS AND CONDITIONS. BUYERS SHOULD NOTIFY
> US IF THEY REQUIRE A COPY.

(DX-20; DX-58).  Bomin also received a copy of this Integr8 Confirmation. (Parrent Decl., ¶ 10).

12.     However, the Integr8 Confirmation contained a quantity change regarding the HFO RMG fuel.  It stated the desired quantity as 1,300-1,300 metric tons (DX-20, p. 1), instead of the plus or minus 10% range called for by Vassilas initial inquiry.  (DX-3).

13.      Consequently, Bomin issued its own "Confirmation of Bunker Sale" (the "Bomin Confirmation") to Garza, reflecting this amended quantity.  (Parrent Decl., ¶ 11).  The Bomin Confirmation contained an express instruction for Integr8 that "a copy of this confirmation shall

4

be sent in its entirety by the broker to the Buyer." (DX-27, at BOMIN003154). Like the Integr8 confirmations, the Bomin Confirmation referenced the seller's standard terms and conditions their governance of the transaction. (*See id.*, at BOMIN003153, "[t]his transaction will be governed by our General Conditions of Sale and Delivery"). The Bomin Confirmation stated that copies of these terms were "immediately available upon request, or via http://www.bomin.com/downloads[.]" (*Id.*, at BOMIN003154).

14.   Consequently, at 1:00 PM CST, Garza issued a revised Confirmation (the "Amended Integr8 Confirmation") to Vassilas with an "AMENDED QTTY RANGE" that specified a quantity range of "1,130 MT – 1,430 MT" for the HFO RMG 380. (DX-21; Parrent Decl., ¶ 13). Page 2 of the Amended Confirmation contained identical language to the first, informing that the bunker nomination was "NOMINATION ACCEPTED IN ACCORDANCE WITH SELLER'S STANDARD TERMS AND CONDITIONS" and directing the buyer to request a copy of if necessary. (*Id.*) A copy of this Amended Confirmation was also supplied to Bomin. (DX-24; DX-60).

15.   This Amended Integr8 Confirmation did not actually match the original inquiry (Parrent Decl., ¶ 13), which called for 1,300 metric tons of HSFO, plus or minus ten percent (DX-3; DX-57), a range that works out to 1,170-1,430 MT. However, Bomin did not object to this new, amended quantity range, and subsequently supplied the Vessel with 1302.54 metric tons of HSFO and 300.10 metric tons of LSMGO on March 8, 2018, at Beaumont, Texas. (Parrent Decl., ¶ 13).

III.   **Bomin's General Conditions of Sale and Delivery (the "General Conditions")**

16.   The "Standard Terms and Conditions" referenced in the Confirmation and Amended Confirmation refer to Bomin's General Conditions (DX-26), which—as noted above— Bomin publicly promulgates through its website. *See Bomin International Group of Companies*

259316679v.1

*General Conditions of Sale and Delivery effective from January 1, 2006*, BOMIN.COM, https://www.bomin.com/fileadmin/content/global_content/downloads/bomin-matrix/Bomin-Group_General-Conditions-of-Sale-and-Delivery.pdf (last visited September 15, 2021).   It is custom and normal practice in the marine fuel industry for sellers to make their standard terms and conditions publicly available on their websites for buyers to have ready access to them.  (Ignozzi-Little Decl., ¶ 22).

17.    The General Conditions contains a provision particularly relevant to this controversy.  Article 14, "Liability and Consequential Damages," states that:

18.    The Seller and/or Supplier shall not be liable for any special, indirect, consequential, punitive or exemplary damage of any kind including but not limited to loss of prospective profits, anticipated cost savings, contracts or financial or economic loss, claims in tort including negligence of the Seller and/or Supplier, its agents, servants or sub-contractors, arising out of, or in connection with, the performance or nonperformance under the Contract. In any event, the liability of the Seller and/or Supplier shall be limited to the price of the Products supplied under the Contract.

(DX-26, Art.14, ¶ 14.1).

19.    According to Therese Ignozzi-Little, a founder and operator of a marine fuel brokerage and trading firm and an expert in bunker transactions with over forty years' experience in the industry (Ignozzi-Little Decl., ¶ 4), it is custom and normal practice in the marine bunker industry for nominations and confirmations to contain standardized language alerting the buyer that a nomination is accepted in accordance with the seller's standard terms and conditions.  (*Id.* at 17).

20.    Furthermore, it is also standard custom and normal practice in the industry for the seller's terms to become part of the contract for sale unless the buyer objects.  (*Id.* at ¶ 18).

6

21.     Additionally, limitation of liability provisions such as those found at Paragraph 14 of the General Conditions are "custom and normal practice" in the marine fuel industry.  (*Id*. at ¶ 24).

22.     Bomin expected its General Conditions to be incorporated into the transaction, as is customary practice in the bunker trade, and did not receive any objection from Liberty Maritime or from Integr8 on Liberty Maritime's behalf.  (Parent Decl., ¶ 12).

## IV.     The Bunkering and Voyage of the M/V Liberty Peace

23.     Liberty appointed Host Agency as its agent "on the ground" to ensure delivery of the bunker fuel, with delivery to take place March 8, 2018 in Beaumont, Texas.  (DX-25; Garza Dep., p. 56; *see also* DX-38, e-mail from Garza informing Parent that Host Agency would serve as Liberty Maritime's agent, and DX-39, bunker scheduling detail communication from Integr8 to Bomin identifying agent and delivery date).

24.     The Vessel received the fuel on Mach 8, 2018 at Beaumont, Texas, with the Chief Engineer signing the receipt for it.  (DX-61).   The final delivery consisted of 1302.54 metric tons of HSFO and 300.10 metric tons of LSMGO on March 8, 2018, at Beaumont, Texas.  (Parent Decl., ¶ 13).

25.     Samples of the fuel were analyzed by Viswa Lab, a company chosen by Plaintiff, which delivered an analysis to the Liberty Maritime Engineering Department on March 20, 2018.  (DX-43).  The fuel analysis report stated the fuel was on-spec, but had slightly high density, and recommended "Reducing the fuel flow through the purifier by as much as 75%." (*Id.* at LIBA 00899).  That same report also warned that "[p]oor purification will fail to remove impurities and catfines from fuel." (*Id.*)

7

26.     After receiving the fuel, the Vessel proceeded on its voyage, and on April 24, 2018, it called upon the Port of Shuaiba, Kuwait, where the Vessel took on board 1000 metric tons of additional IFO 380 fuel. (DX-150 at LIBA00070). On that date, the Vessel began consuming the IFO fuel received from Bomin. (DX-42).

## V.     Mechanical Problems on Board the Vessel Develop

27.     After switching to the Beaumont IFO fuel on April 24, 2018, the frequency of the automatic shoot, that is self-cleaning, cycles of the fuel filters for the main engine ("ME") generator and diesel generators ("DG") began to increase.  By April 25, 2018, according to the Vessel's Chief Engineer, use of the fuel led to an "[i]mmediate increase in frequency of Diesel Generator Back Flush Filter Shoots."  (DX-42).

28.     From April 24 through April 30, 2018, only a single fuel purifier, the No. 2 FO Purifier, was online.  (DX-156, at LIBA 000481-493).  The crew brought a second FO Purifier, the No. 1 purifier, online on April 30, 2018.  (*Id.* at LIBA 000493).

29.     Between January 19 and April 23, 2018, the generator fuel filters had averaged 11 and 12 automatic shoot cycles per day.  (Daly Decl., ¶ 11, citing LIBA 000288-000480, DX-153 through DX-156).  By May 3, 2018, the Engine Log recorded automatic shoot cycles for the previous twenty four hours for the ME and DG automatic fuel filters of 19 and 42 cycles respectively.  (Daly Decl., ¶ 13, citing DX 157 at LIBA 000499).

30.     Later that day, the Vessel experienced a disruption of electrical power, due to the failure of the No. 3 auxiliary engine at 1233 hours, as recorded by the Engine Room Alarm records. (DX 158 at LIBA 003432-33). During this portion of the voyage, the Deck Logs note the Vessel was experiencing rough seas. (*See, e.g.*, DX-151 at LIBA 000179).  On May 4, 2018, problems

8

continued, with the Chief Engineer reporting an "[i]ssue with no. 3 Diesel Generator sticking racks because of carbon deposits."  (DX-42).

31.     The crew was unable to repair this engine and it was out of service until repairs were later completed in Egypt on May 21, 2018. (DX-164 at LIBA 0001541).

32.     Following the loss of the No. 3 auxiliary engine on May 3, 2018, the Vessel's No. 1 Diesel Generator experienced numerous failure alarms (DX-49), and the Vessel ultimately suffered a "loss of propulsion" due to the disruption of electrical power.  (DX-159 at LIBA 00645). Following the blackout and loss of propulsion, the No. 2 Diesel Generator also experienced numerous failure alarms.  (DX-49).

33.     Later that day, the crew put the ME automatic filter into bypass mode, due to primary filter clogging. (DX-49 at LIBA 003432-33).   Additionally, the Engine Logbook documents 43 automatic shoot cycles on May 4, 2018 and 54 shoot cycles on May 5, 2018 for the DG automatic fuel filter. (DX-157 at LIBA 000501-503).  The DG automatic fuel filter was then bypassed for cleaning on May 5, 2018, and remained in the bypass mode for seven hours.  (*Id.*).

34.     On May 6, 2018, the Vessel reached the Port of Aqaba, Jordan; the vessel drifted ashore while awaiting berth, and ultimately berthed May 11, 2019.  (DX-151 at LIBA 00183-187).

35.     While the Vessel drifted near Aqaba, the number of automatic shoot cycles had increased further.  By May 9, 2018, the Engine Room Logbook documented 105 automatic shoot cycles for the DG automatic fuel filter.  (DX-157 at LIBA 000511).  Zero automatic shoot cycles were recorded for both the main engine and the auxiliary engine automatic fuel filters from noon on May 9 to noon on May 10, 2018, but no explanation for this is provided in the Vessel's record. (*Id.* at LIBA 000511-513).  On that date, the Chief engineer reported the prior failure of the No. 3 Diesel Engine to Liberty Maritime's management.  (DX-42).

36.     On May 11, 2018, the Vessel's crew bypassed the DG automatic fuel filter for cleaning at 0916 hours, and bypassed the ME automatic fuel filter for cleaning at 2303 hours. (*Id.* at LIBA 000515).

37.     Notably, between May 3, 2018 and May 12, 2018, the Vessel experienced numerous fuel supply and electrical generation issues, evidenced by the Vessel's Engine Room Alarm Printouts.  (*See* DX-49 at LIBA 003434-3444, reporting a series of viscosity alarms, pressure alarms, start failures for the No. 1 and No. 2 Diesel Generators, power abnormalities, and exhaust deviations).

38.     On May 12, 2018, the Vessel departed Aqaba, Jordan at 0330 hours (DX-151 at LIBA 000188), despite that: (i) numerous alarms that day had occurred regarding the No. 1 Diesel Generator (DX-158 at LIBA 003445; DX-157 at LIBA 00517), (ii) the No. 3 Diesel Generator was out of service since May 3, 2018 (DX-42), and (iii) both the ME and DG automatic fuel filters were bypassed at the time of departure.  (DX-157 at LIBA 00517).  The Vessel's departure was made amidst further rough seas.  (DX-54).

39.     After departure, the DG automatic filter was brought back online at 0855 hours and the ME automatic filter was brought back online at 0904 hours. (DX-157 at LIBA 00517).  However, the DG automatic filter rapidly clogged and was again bypassed at 1600 hours.  (*Id.*)

40.      By 1718 hours, the Nos. 1 & 2 Diesel Generators failed, and the main engine shutdown.  (DX-54).  The engine alarm log indicates low fuel pressure to the No. 2 Diesel Generator, accompanied by a low bus voltage alarm for Diesel Generators Nos. 1 & 2 DG (DX-158 at LIBA 003446), which indicates that the DG automatic filter's bypass filter had clogged, causing low fuel pressure to the generator, resulting in a blackout and loss of propulsion, at approximately 1717 hours. (Daly Decl., ¶ 23).

41.     In a subsequent statement, the Vessel's Chief Engineer reported that despite "[c]leaning of the Diesel Generator Bach [sic] Flush Filter" a "Dead ship" situation resulted on May 12, 2018. (DX-42).

42.     After loss of power, propulsion and control, the Vessel was towed to by tug to the Port of Suez for inspection and repairs.  (Verified Compl., ¶¶ 8-9).

## VI.     The Crew of the Vessel and Plaintiff's Management Failed to Take Prudent Action

43.     During the voyage, the crew and management of the Vessel made numerous errors that caused the Vessel's "dead ship" incident.  As noted above, the Viswa Lab reported that the fuel was in conformance with ISO 8217:2010, with the exception of its density, and due to the density of the fuel the lab recommended to "[i]mprove purification efficiency by: Reduc[e] fuel flow through purifier by as much as 75% rated capacity."  (SoF, Part IV, ¶ 25, *supra*).  That same report also warned that "[p]oor purification will fail to remove impurities and catfines from fuel." (*Id*.)  Catfines are small hard particles that can cause abrasive wear to engine components.  (Daly Decl., ¶ 27).  The Report listed as catfine level of 36 ppm in the Beaumont fuel.   (Daly Decl., ¶ 50).

44.     However, engine room records reflect that between April 24, 2018 and April 30, 2018, only a single fuel purifier was in use during consumption of the Beaumont fuel, with a second purifier brought online only on April 30, 2018.  (DX-156 at 00493, stating "#1+#2 HFO purifiers online @1700l/h" on April 30, 2018, and at LIBA000481-493, recording zero operating hours for purifier No. 1).

45.     This conflicted with the Vessel's operations manual, which provided in relevant part at Section 5.4.7, "Fuel Oil Purifiers",  that "[t]he throughout rate should be minimized and the sludge discharge cycle period should be maximized to the extents needed to effectively purify the

fuel with the least amount of sludge discharge possible." (DX-45). "Fuel oil analysis results will provide additional guidance how the purifiers should be set up and if it is recommended to run two units in parallel.  The vessel should consult with LMC engineering if any abnormal results have been determined by the fuel oil analysis."  (*Id.*)

46.     Furthermore, while Viswa Labs had recommended reducing fuel flow, at the time the second purifier was brought online, throughput was at 5400 liters per hour (DX-117).

47.     This exceeded the Vessel's own posted "Mandatory Feed Rate" of 2400 liters per hour for one purifier and 1200 liters per hour with both purifiers online (Daly Decl., ¶¶ 36-38).

48.     Additionally, the crew failed to maintain sufficient spare parts for critical equipment relating to the engines.  For example, the Chief Engineer Turnover Reports for December 17, 2018 and February 21, 2021 documented a lack of onboard spare parts for fuel injector equipment (DX-107 at LIBA 001851 and DX-108 at internal page 4), and the amount of time the automatic fuel filters were set to bypass and cleaned suggests there were not spares onboard for them.  (Daly Decl., ¶ 80).

49.     Moreover, the crew further caused the Vessel's damages by failing to switch to an alternative fuel.  As the above recitation of facts makes clear, it was apparent almost immediately after switching to the Beaumont IFO that the ship was experiencing operational difficulties.  (DX-42).  The crew had the option to cease consumption of the Beaumont IFO fuel and investigate, and switch the IFO fuel loaded April 24, 2018 in Shuaiba, Kuwait.  (SoF, Part IV, ¶ 26, *supra*).

50.     Next, the Vessel's crew left a safe port at Aqaba while operational difficulties were ongoing; specifically:

(i)     Numerous engine room alarms documented ongoing problems between May 9 and May 12, 2018 (DX-158 at LIBA 003442-3446);

12

(ii)     The No. 3 Diesel Generator remained offline (DX-164 at LIBA 0001541);

(iii)    The heightened number of automatic cleaning cycles was ongoing, having reached 105 cleaning cycles for the DG automatic cleaner (DX-157 at LIBA 000511); and

(iv)    The Vessel apparently lacked a complete complement of spare parts for the fuel filters, as it constantly relied on bypassing and cleaning them (*see, e.g.*, DX-52, noting the ME filter was in a bypassed state).

51.     Finally, the crew failed to report the May 3, 2018 loss of propulsion to management until nearly a week later on May 9, 2018. (DX-42).  Furthermore, upon learning of the loss of propulsion, Liberty Maritime management apparently took no action to investigate the issue and did not direct the Vessel to stay in port until it had assessed the operational problems and effectuated all necessary repairs.

**VII.     Notification of the Claim**

52.     On May 17, 2018, Chris Turner of Integr8 fuels, acting "AS BROKER ONLY" advised Michael Parrent that Integr8 had received notification of a quality claim regarding the Vessel, and placed Bomin "on notice for any / all costs, damages and/ or penalties that may occur as a result of this claim." (DX-22).  Turner's communication alleged that the Vessel "experienced multiple engine casualties while consuming the Bomin supplied fuel."  (*Id.*)

53.     On May 17, 2018, Vincent Terracciano of Bomin replied to Turner.  Terracciano directed Turner to Article 8 of Bomin's General Conditions, noting "[t]he vessel was supplied on March 8th yet this is the first time we have been notified of any issues with the consumption of thefuel [sic]."  (DX-23).  Citing the General Conditions, Terracciano then stated that "Bomin's

13

claim period is 14 days from the date of delivery" and "[a]s such … this claim is time barred." (*Id.*; *see also* DX-65 and Terracciano Decl., ¶ 8).

## VIII.   Plaintiff's Claim for Damages

54.     From this occurrence, Plaintiff asserts a claim of damages in the amount of $1,422,765.52 (Joint Pretrial Order, dated September 24, 2021, section iv(a)(vii)), predicated on claims of breach of contract, breach of express and implied warranty, and negligence (Verified Compl., Counts I-V).   Exhibits proffered by Plaintiff claim two tranches of damages.

55.     Plaintiff's Statement of Claim - Part I (Plaintiff's Exhibit 154), seeks a total of $930,259.64 for 2018 charges incurred after the "dead ship" occurrence.  (*Id.* at LIBA 005993). The primary components of this claim are $561,761.53 of costs allegedly incurred at the Port of Suez, such as for tug assistance, port agent disbursements, costs for management attendance at inspections, service engineer visits, and as well as expenses for fuel, crew, and stores.  (*Id.*)  This tranche also claims damages for debunkering the fuel and cleaning the Vessel tanks, and additional expenses for fuel sampling, spare parts, and various other charges following the May 12, 2018 blackout and loss of propulsion.  (*Id.*)

56.     Plaintiff's Statement of Claim – Part II (Plaintiff's Exhibit 188), seeks a total of $492,505.86 from *2020*, years after the incident, for repairs to the Vessel's engine while she lay in port in Bahrain (*see generally, id.*).  This include port agent disbursements, repair work costs, parts, fuel, and testing.  (*Id.* at LIBA 006230).

57.     For the reasons that follow, the facts of this case and applicable law establish that Plaintiff is not entitled to any of these damages.

14

**ARGUMENT**

**I.      The Parties Entered into a Written Contract Foreclosing Plaintiff's Damages Claim**

It is dispositive of Plaintiff's claim that they are barred from seeking the various consequential damages that they claim under the parties' contract. (SoF, Part VIII, ¶¶ 54-57). The record establishes that the parties entered into a written (not verbal) contract that clearly incorporated Bomin's industry-standard General Conditions, including its limitation of liability which preclude Plaintiff's consequential damages claim (as well as its tort claim).

**A.  The Parties Did Not Enter into a Verbal Contract**

As an initial matter, it must be addressed that the parties' contract in this case is *written*, evidenced by the e-mail communications, purchase orders, and confirmations exchanged among Plaintiff, Defendant, and Integr8, which suffice to establish contracts, particularly here where the action is governed by the Uniform Commercial Code. *See European School of Economics Foundation et al., v. Teknoloji Holdings, A.S.*, 2011 U.S. Dist. LEXIS 47691, *15 (S.D.N.Y. May 4, 2011) (various e-mail communications sufficient to establish the parties recognized a basic agreement and constitute a written contract); *Empro Sys. v. Namasco Corp.*, 382 F. Supp. 2d 874, 880-881 (S.D.Tex. 2005) (purchase order and confirmation sufficient to establish a contract for sale under U.C.C.).[4]

---

[4]      The Court need not engage in extensive conflict of laws analysis, as both New York and Texas incorporate the Uniform Commercial Code, which governs this contract of sale between merchants, and the laws of both states would recognize a contract under these facts. *Smith v. Mitlof*, 148 F. Supp. 23d 279, 285 (S.D.N.Y. 2001); *see also East River Steamship Corp. v. Transamerica Delawal, Inc.*, 476 U.S. 858, 872 n. 7 (1986) (Supreme Court noted that any claim for breach of warranty by a ship charterer would be governed by the UCC,  explaining that "contracts relating to the … supply of materials to a ship are not within admiralty jurisdiction" and instead, "[s]tate law would govern the actions … [i]n particular, the Uniform Commercial Code, which has been adopted by 49 states"); *see also Alaska Russia Salmon Caviar Co., Inc. v. M/V "Marit Maersk,"* 2000 WL 145124, 45 Fed.R.Serv.3d 743 (S.D.N.Y. Feb. 2, 2000) (in admiralty suit concerning sale of goods, Court applied UCC as adopted by New York); *M/T King Dorian*

15

Plaintiff attempts to claim through the contentions of its expert Adrian Tolson that the contract was *verbal*, with agreement reached prior to the parties' exchange of the purchase order and confirmations, based on a "final verbal agreement" between Liberty Maritime executive Vassilas and Garza, who Plaintiff's claim had "authority" from Liberty Maritime and Bomin following written or verbal communications from Michael Parrent.  (Plaintiff's Exhibit 43, ¶¶ 6.1-6.2).

However, Plaintiff's position overlooks that (i) Parent conducted all negotiations with Garza via electronic mail, and has no recollection of ever speaking to him by phone or text (Parrent Decl., ¶ 8), (ii) as broker, Integr8, acting on behalf of *Liberty Maritime* had no "authority" from Bomin, and (iii) even more critically, documents exchanged following the supposed "telecom" between Garza and Vassilas (DX-16; DX-18) contained variations of price, leaving a material term unsettled.   (*See* Ignozzi-Little Decl., ¶ 20, "Quantity is a key requirement in a contract for marine fuel and it *must* be agreed upon by a buyer and seller before a deal is concluded").

As examined below, the exchange of confirmations introduced uncertainty as to the material quantity term, keeping the operative cycle of offer and acceptance ongoing.  Additionally, and also examined below, even if initial agreement had been reached by verbal agreement, under applicable U.C.C. provisions (codified at N.Y. C.L.S. U.C.C. § 2-207 and Tex. Bus. Code § 2.207) in sales between merchants a written confirmation may contain terms in "addition to or different from those offered or agreed upon" and become part of the contract unless they materially alter the deal or objection to them is received.  Thus, the "verbal agreement" argued by Plaintiff does not reflect the parties' actual, binding contract.

---

*Tankschiffarts GmbH & Co. v. Anchor Marine & Industrial Supply, Inc.*, 2018 WL 8732184 (S.D.Tex. Nov. 30, 2018) (applying UCC principles and case law to breach of warranties claims in maritime suit stemming from supply of anchor equipment to vessel).

259316679v.1

## B. The Parties Entered into a Written Agreement that Incorporated Bomin's General Conditions

Under the U.C.C., a contract formed incorporating the Bomin General Conditions under two avenues, the first through the route of offer and acceptance, and the additional incorporation of the General Conditions.

The progression of offer and acceptance must be clearly traced here. Plaintiff attempts to narrow it to Bomin's "firm quotes" constituting an offer and Liberty Maritime's alleged acceptance by Garza and Vassilas. (*See* Argument Part I(A), *supra*)). However, it is subject to dispute whether Bomin's price quotations were offers or merely invitations to offer, that required additional negotiation to ripen into a contract.[5] Nevertheless, it is clear that the offer and acceptance cycle did *not* close with the alleged "telecom." Instead, it remained open due to ongoing uncertainty regarding the quantity term.

As set forth above, Integr8 and Bomin exchanged a series of confirmations with differing quantity terms, ones that differed from the original inquiry, which specified 1,300 MT of fuel in a range of plus or minus ten percent. (SoF, Part III, ¶¶ 11-15). This was no mere "clerical error," or "bureaucratic amendment" as Plaintiff suggests (Plaintiff Exhibit 43, ¶¶ 8.4-8.5), because it left a core, material term of the contract unsettled. *See Rainier Southlake DST v. Woodbury Strategic Partners Fund, LP*, 2017 Tex. App. LEXIS 11407 (Tex. App. Dec. 7, 2017) (quantity is a material

---

[5]    *See, e.g., J.D. Fields & Co., Inc. v. U.S. Steel Int'l, Inc.*, 426 Fed. Appx. 271, 276-277 (5th Cir. 2011); *see also Litton Microwave Cooking Prods. V. Leviton Mfg. Co., Inc.*, 15 F.3d 790 (8th Cir. 1994); *Rhenalu v. Alcoa, Inc.*, 224 F. Supp. 2d 773 (D.De. 2002) ("mere price quotations without other contractual terms … do not constitute offers"); *Trell v. American Ass'n of Advancement of Science*, 2007 WL 1500497, *6 n. 10 (W.D.N.Y. 2007) (collecting cases that promotional information to solicit offers, including price lists and price quotations, do not constitute offers); *Maverick Int'l, Ltd. v. Occidental Mukhaizna LLC*, 2011 U.S. Dist. LEXIS 160199 (E.D.Tex. Mar. 1, 2011) (price quotes, though specific, made informally by e-mail lacking specification of the "legal terms that would govern the order" considered an invitation to offer, not an offer).

term that must be settled for contract formation); *Berkson v. Gorgo LLC*, 97 F. Supp. 3d 359, 392 (E.D.N.Y. 2015) (quantity is a material term in contracts that must be sufficiently definite). Even Plaintiff's own expert concedes that "quantity must be finalized … so as to specify the quantity to be loaded." (Plaintiff Exhibit 43, ¶ 8.1).

Thus, the power of acceptance lay with Bomin, who accepted Plaintiff's offer to purchase fuel when it confirmed its willingness to enter into the transaction and actually delivered the fuel. *See Menendez v. Faber Coe & Gregg, Inc*., 345 F. Supp. 527, 563 (S.D.N.Y. 1972) (modified by 485 F.2d 1355) (seller's acceptance of an offer occurs when goods are delivered); *Brochsteins, Inc. v. Whittaker Corp*., 791 F. Supp. 660 (S.D.Tex. 1992) (seller's agreement to fill purchase order operates as acceptance of the buyer's offer).

Consequently, the cycle of offer and acceptance remained open when the documents were exchanged that expressly referenced Bomin's General Conditions. Crucially, under applicable U.C.C. provisions, Bomin could introduce its General Conditions either as an acceptance of an outstanding offer, or as a written confirmation of an existing agreement, so even if Tolson's theory is correct (and it is not), Bomin's General Conditions would still become part of the contract.

Section 2-207 of the Uniform Commercial Code governing contracts for sale between merchants, and provides in relevant part that a "seasonable expression of acceptance or a written confirmation operates as an acceptance even though it states terms additional to or different from those offered or agreed upon" and those terms are "construed as proposal for additional to the contract" that "between merchants … become part of the contract" unless, as potentially applicable here, they "materially alter it" or the counter party objections to them. N.Y. C.L.S. U.C.C. § 2-207(1)-(2) and Tex. Bus. Code § 2.207(a)-(b).

Whether considered an acceptance or a confirmation, Bomin's immediate Confirmation of the amended quantity range placed the General Conditions into consideration for inclusion in the parties' final agreement.   Therefore, regardless of Plaintiff's other contentions concerning the contract's formation, they must show that the proposed terms were a material alteration or that they objected to it.   They can do neither.

First, it is indisputable that Plaintiff did not object to the General Conditions.   Bomin received no such objection (Nelson Decl., ¶ 12), and there is nothing in the record to suggest Liberty attempted to make any objection, either itself or through Integr8.[6]

Next, the terms do not represent a material alteration.   Material alterations are those that "result in surprise or hardship if incorporated without express awareness of the other party." U.C.C. § 2–207, Comment 4.   Typically, clauses that cause such surprise or hardship are those that "significantly deviate from industry norms."   *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 102 (S.D.N.Y. 2002).   The burden of proving the materiality of the alteration falls on the party opposing the term's inclusion. *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 223 (2d Cir. 2000).

Here, the Bomin General Conditions, and the limitation of liability provisions they contain, are not material alterations.   Plaintiff makes no effort to argue that they are.   Nowhere in Plaintiff's expert report on custom and usage in the marine fuel industry is there any discussion as to whether the limitation of liability provisions are atypical or deviate from industry practice.   (*See* Plaintiff

---

[6]     It is not necessary for the confirmation to have included a copy of the General Conditions, which were in any event publicly available, a regular practice among fuel suppliers.  (SoF, ¶ 16). A party's standardized terms and conditions may be incorporated by reference, provided they are expressly identified in an operative writing, even if they are not attached to the instrument that forms the primary foundation of the contract. *See Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 150 (2d Cir. 2004).

Exhibit 43).  Plaintiff's expert merely quibbles over whether he believes a seller's referenced terms and conditions generally become part of a deal.  (*Id*. at ¶¶ 6.10, 9.2).  In contrast, Defendant's expert testified clearly that such limitations of liability on the part of sellers are industry custom and practice (Ignozzi-Little Decl., ¶ 24), and even Plaintiff's expert had to concede that he is familiar with these clauses and they are "not unusual."  (Deposition of Adrian Tolson at 33:20-35:4).

Accordingly, there is no basis to exclude the General Conditions from the parties' contract. *See Tosco Corp. v. Oxygenated Marking and Trading A.G.*, 1999 WL 328342 (S.D.N.Y. May 24, 1999) (seller's acceptance of buyer's offer incorporated by reference standardized terms and conditions, which became part of the contract as buyer did not object to their inclusion and presented no evidence the terms deviated from industry standard); *Oceanconnect.com, Inc. v. Chemoil Corp.*, 2008 WL 194360 (S.D.Tex. Jan. 23, 2008) (seller's standard terms and conditions became part of contract for bunker fuel where, as here, the order confirmation issued upon the broker's bunker nomination stated that the seller's terms and conditions would apply, and despite opportunity to obtain and object to the terms, the buyer failed to do so, and the terms became part of the contract as they did not materially the agreement).

Ultimately, Plaintiff was (i) repeatedly notified that the transaction was subject to Bomin's General Conditions, (ii) had every opportunity to request Bomin's General Conditions and object to them, and (iii) failed to do so.  It cannot not now contest the General Condition's inclusion.  *See Lion Copolymer, LLC v. Kolmar Americas, Inc.*, 147 A.D.3d 586 (N.Y. App. Div. 1st Dep't 2017) (Terms and Conditions included with Transaction Confirmation became part of contract where plaintiff failed to object to their inclusion); *Morales Elec. Contracting, Inc. v. Siemens Building Technologies, Inc.*, 2012 WL 1038865 (E.D.N.Y. 2012) (Terms and Conditions identified in

20

instrument incorporated by reference into contract, even though the Terms and Conditions were not attached to the parties' writings, where plaintiff failed to object to them); *Nirvana International, Inc. v. ADT Sec. Services, Inc*., 525 Fed. Appx. 12, 15 (S.D.N.Y. 2013) (limitations contained in Terms and Conditions binding where party opposing them expressed no objection to them, and permitted other party to perform under the contract, "effectively capitulat[ing] to them"); *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc*., 687 F. Supp. 820 (S.D.N.Y. 1988) (terms and conditions referenced on acknowledgement form became part of contract where opposing party failed to object to them)' *In re Kyocera Wireless Corp.*, 162 S.W.3d 758 (Tex. App. 2005) (terms and conditions set forth in written confirmation became binding where receiving party never objected to them).

### C. Terms and Conditions Bar Plaintiff's Claims for Consequential Damages

With the inclusion of Bomin's General Conditions, Article 14 and its limitation of liability and prohibition against negligence claims (SoF, Part III, ¶ 16) operates as a bar to Plaintiff's damages claims. Plaintiff's claims for damages consist of purely consequential damages arising in 2018 (and bizarrely, 2020) from the May 12, 2018 accident, including repair costs, port fees, inspections, additional insurance and transportation costs, crew wages, and replacement parts, and damages arising from loss of use of the vessel and delay. (SoF, Part VIII, ¶¶ 54-57). These damages do not reflect Plaintiff's direct, benefit-of-the bargain loss for allegedly defective fuel, and such damages are clearly consequential in nature. *Austin v. Servac Shipping line*, 794 f.2d 941,947 (5th Cir. 1986) (describing such damages as consequential); *Trump Int'l Hotel v. Carrier Corp.*, 524 F. Supp. 2d 302 (S.D.N.Y. 2007) (costs of repair and damages for loss of use are consequential in nature). Consequently, the parties' written contract definitively bars Plaintiff's damages claims here and they cannot recover against Bomin.

21

## II.      Plaintiff Failed to Carry Its Burden of Proof

Next, even if the parties' contract did not foreclose the claim, Plaintiff's action must still fail because Plaintiff has not met its burden of proof.  Whether styled breach of contract or warranty, Plaintiff bears the burden of proof both to establish that the fuel was contaminated or unsuitable, *and* that such contamination was the cause of their injuries.  *Antilles Shipping Co. v. Texaco, Inc*., 321 F. Supp. 166, 167 (S.D.N.Y. 1970).  Plaintiff here does neither, having failed to establish fuel contamination, as set forth below, and overlooking that its own failures resulted in its damages (*see* Part III, *infra*).

Competent expert testimony is required when Plaintiff must provide proof of complex or technical issues that would be unfamiliar or outside the experience of a fact finder, including in breach of warranty, contract, and tort cases.  *U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 412 (S.D.N.Y. 2016).[7]   However, Plaintiff's proffered expert testimony of Christopher Fisher, which is subject to a separate motion *in limine*, falls short.  Simply put, Mr. Fisher is not a chemist, nor does he claim to be.  (*See* Deposition of Christopher Fisher at 15:17-16:2; 19:25-21:3) (stating that his expertise is in marine engineering, on matters such as fuel handling and vessel machinery, but he is not offering any opinions on petroleum processing

---

[7]      *See e.g.*, *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 387 F. Supp. 3d 323, 341 (S.D.N.Y. 2019) (finding expert testimony required for issues touching on complex scientific issues outside common knowledge and experience, and noting "all jurisdictions" require expert testimony on such issues) (citations omitted); *Excel Fortress Ltd. v. Wilhelm*, 2020 U.S. Dist. LEXIS 49706 (D. Ariz. Mar. 23, 2020) (expert testimony required concerning claims regarding "specialty chemical compounds"); *Am. Mech. Solutions, L.L.C. v. Northland Process Piping, Inc.*, 184 F. Supp. 3d 1030, 1070 (D.N.Mx. 2016) (applying Texas law, expert testimony required when dealing with questions of chemistry and engineering); *Qualls v. State Farm Lloyds*, 226 F.R.D. 551, 557 (N.D.Tex. 2005) (chemical exposure cases require expert testimony); *Invista N. Am. S.À.R.L. v. M&G USA Corp.*, 951 F. Supp. 626, 652 (D.De. 2013) (collecting cases) (issues of chemistry require expert testimony to aid the fact finder); *Andrew v. Dial Corp.*, 143 F. Supp. 522, 529 (W.D.Tex. 2015) (issues of "chemistry, physics and electrical engineering, outside the common understanding of a layperson," require expert testimony).

chemistry or physical chemistry testing).  Mr. Fisher did not conduct any independent testing or analysis as a chemist, merely offering his inferences as marine engineer as to the existence and source of contamination based on exhibits provided to him by Plaintiff.

In actuality, only one expert with advanced knowledge of chemistry and chemical engineering has opined in this matter, Gregory McCormack.  And contrary to Mr. Fisher, Mr. McCormack, a chemical engineer with fifty years experience (McCorck Decl., ¶ 3), found that:  (i) the Bomin fuel met required standards (McCormack Decl. ¶ 7); (ii) elements in the fuel later identified through Gas Chromatograph Mass Spectrometer ("GCMS") testing (itself a non-standard test) identified only a minor concentration of chemicals in the parts per million range (*id*. ¶¶ 8-10, 12, 19); (iii) those chemicals likely originated in the crude oil, not the refining process, due to chemicals used in the shale fracking oil extraction process (*id.* at  ¶¶ 11, 18); and (iv) those chemicals would not have been detrimental to the machinery of the Vessel (*id*. at ¶ 19).  Thus, the only qualified expert in the case has opined *against* fuel contamination and causation.

Other testimony and evidence contradicts Mr. Fisher's speculations.  For example, the MAN Service Report, dated May 20, 2018 (DX-111), contained no references "to corrosive wear that would indicate chemical contamination" or any deficiencies in engine components that "could reasonably be attributed to chemical contamination of its fuel supply."  (Daly Decl., ¶¶ 49-51).  While it noted the presence of foreign particles, that presence can be attributed to "improper fuel oil treatment of the fuel supply," not chemical contamination.  (*See* Argument. Part III(A) *infra*).  Moreover, Marine Engineer John Daly examined the MAN Service Report and other inspection documentation, and determined that any wear observed in the Vessel's engine components could be attributed to abrasive wear due to failure to properly purify and treat the fuel onboard. (Daly Decl., ¶¶ 46-57).  Daly also examined records the demonstrate that the vessel had experienced

problems starting the Diesel Generators prior to the consumption of the Beaumont fuel, and continued to experience them after consumption of the Beaumont fuel ceased and after the engines were overhauled.  (*Id*. at ¶¶ 58-66).  According to Daly, such occurrences are consistent with improper purification and treatment of fuel, not chemical contamination.  (*Id*. at ¶¶ 58-60).

Finally, the joint testing conducted in this case undermines Mr. Fisher's speculations.  The parties entered into an October 22, 2019 protocol to govern joint testing of a sample of the fuel. (DX-209).  Intertek (Sunbury) conducted the joint testing, and memorialized it in a joint report dated December 12, 2019.  (DX-173).  Contrary to establishing contamination, its GCMS testing yielded no clear evidence for the presence of non-petroleum components in the fuel, and Fourier Transform Infrared testing showed only *de minimis* levels of carbonyl-containing components. (DX-173; Nelson Decl., ¶ 28).

Simply put, there is not qualified expert testimony or evidence establishing that the fuel was contaminated, or sufficiently linking it to the Vessel's damages to establish causation. Plaintiff has wholly failed to prove contamination and causation by a preponderance of the evidence.  Having failed to provide contamination, they cannot recover.

**III.    Plaintiff Failed to Mitigate, and In Fact Caused, Its Own Damages**

Finally, Plaintiff cannot recover because they both failed to mitigate its damages, and in fact proximately caused them.  Applicable law requires parties to take reasonable steps to minimize their damage, and also finds that claimant's own negligence and imprudent action breaks the causal chain, and renders the claimant responsible for his own harms.  As set forth below, Plaintiff's management and the Vessel's crew caused the May 12, 2018 dead ship incident that resulted in Plaintiff's damages claim through their own imprudent action, and at a bare minimum this represents failure to mitigate.

## A.     Applicable Law Would Bar Recovery Here

Once again, the Court need not engage in any searching conflict of law analysis, as both New York and Texas law are substantially similar.  Under Texas law, the doctrine of avoidable consequences, or mitigation of damages, prevails and requires an injured party to use reasonable efforts to avoid or prevent losses. *See Pulaski Bank & Trust Co. v. Texas Am. Bank/Fort Worth, N.A.*, 759 S.W.2d 723, 735 (Tex. App 1988). "The burden of proving a failure to mitigate is upon the party who caused the loss and the standard is that of ordinary care, i.e., what an ordinary prudent person would have done under the same or similar circumstances."  *Hygeia Diary Co. v Gonzalez*, 994 S.W.2d 220, 224 (Tex. App. 1999) ( ("The [Texas] supreme court found simply that damages resulting from such failure [to mitigate] are ultimately not proximately caused by the wrongdoer's acts or omissions, but by the injured person's own subsequent negligence, and are thus not recoverable from the wrongdoer") (internal quotations omitted).

New York law mirrors Texas in this respect, which also recognizes a duty to mitigate damages and holds that a plaintiff who fails to mitigate may not recover damages. *U.S. Bank National Association v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440 (S.D.N.Y. 2010).  New York law also recognizes that a plaintiff's own conduct may break the proximate causation chain.  *See Federal Ins. Co. v. Sabine Towing & Transp. Co*., 783 F. 2d 347, 352 (2d. Cir. 1986); *Bellvue South Assoc. v. HRH Constr. Corp.*, 78 N.Y.2d 282 (N.Y. 1991).

**B.      The Factual Record Is Replete with Conduct by Plaintiff Causing, or at the Very Least Failing to Mitigate, Their Damages**

These legal principles warrant denial of recovery here, where the factual record is rife with conduct by Plaintiff and its agents that either caused or failed to mitigate their damages.  Plaintiff's core failures may be summarized as follows.

**1.   The Beaumont IFO Fuel Was Not Properly Handled or Treated by Plaintiff**

As set forth in detail by expert John Daly, marine engineer, the disruption of electrical power and losses of propulsion on May 3 and May 12, 2018 "can be attributed to the improper onboard fuel handling and treatment" of the Vessel's crew, and the crew's "failure to follow the recommendations provided in the fuel analysis report for this fuel."  (Daly Decl., ¶ 25).

As noted, by the time the second purifier was brought online, the throughput rate stood at 5400 liters per hour, in violation of Viswa Labs recommendations and the posted limits on the Liberty Peace.   (SoF, Part IV, ¶ 25; *see also* Daly Decl., ¶¶ 26-).  This was also far in excess of what standard marine practice would have dictated, which as stated by engineer John Daly would be a throughput rate of approximately 1500 liters per hour to ensure the most efficient purification possible.  (Daly Decl., ¶¶ 30-35).  Additionally, the catfine level of the Beaumont fuel (*id*. at ¶ 43), would not have caused operational difficulties or engine wear had the fuel been properly purified and treated onboard by the Vessel's crew.  (Daly Decl., ¶ 50).

The increase of automatic cleaning cycles in the DG and ME automatic fuel filters also indicates that the fuel was not properly treated and purified.  (*Id*. at ¶¶ 67-81).  Additionally, the rough seas experienced by the vessel (SoF, Part V, ¶¶ 30, 38) could have contributed to an increase in impurities in the fuel as rough seas agitate fuel tanks, causing impurities that have settled in the tanks to become mixed into the fuel supply.  (Daly Decl., ¶ 72).   Notably, the excessive number of cleaning cycles continued even *after* consumption of the Beaumont fuel ceased.  (*Id*. at 74).

26

### 2. The Vessel's Crew and Management Failed to Maintain Necessary Equipment and Spare Parts

The Chief Engineer Turnover Report dated December 17, 2018 documented a lack of onboard spare parts for the DG's FO injection equipment (DX-107 at LIBA 001851, noting lack of sufficient "conical sealing washers"), and Turnover Report dated February 28, 2021, months later, documented that repairs to injector equipment were being deferred due to a lack of spare parts. (DX-108 at internal page 4).

Normally, a vessel carries full sets of spare filter components for filter units, but the amount of time the ME and DG automatic fuel filters were in bypass indicates they were no available spares, and that existing filter elements were removed, cleaned, and reinstalled. (Daly Decl., ¶ 80). The ship's reliance on bypass units given a lack of spares also likely contributed to its loss of propulsion, as the bypass filters for the DG filter are 37-micron filters, which allow larger particles through than the 10-micron filter normally fitted for the DG filter. (*Id*. at ¶¶ 75-76). The DG filter was bypassed three times between May 5 and the blackout on May 12, during which time "generator engine fuel injection equipment would have been exposed to more contaminants of greater particle size than would have been the case if the DG Automatic Fuel Filter (with its 10-micron filter elements) had been able to stay online." (*Id.* at ¶ 76).

This was inexcusable as equipment relating to power generation is "critical equipment" (Foran Decl., ¶ 70), and a "prudent mariner would ensure ample critical parts to enact emergency repairs to critical equipment" (*id*. at ¶ 74). The Vessel simply lacked sufficient critical parts to make necessary repairs. (*Id*. at ¶¶ 69-77).

Additionally, correspondence between Liberty Maritime and MAN suggests that the Vessel lacked sufficient spare parts to conduct even a limited inspection. (Daly Decl., ¶¶ 110-113, citing DX-218).

27

### 3.      The Vessel Left Aqaba, a Safe Port, Prematurely

The crew's decision to leave Aqaba was critical, and ultimately caused the May 12 dead ship incident.  Numerous warning signs existed that rendered this decision patently imprudent and unreasonable.

*First*, engine room alarm printouts documented numerous alarms between May 9 and May 12, 2018 "indicat[ing] that … electrical generation during this time was unsteady and unreliable." (Daly Decl., ¶ 93; *see also* SoF, ¶ 50, *supra*, and Daly Decl., ¶¶ 93-99, summarizing key alarms). This should have "lessened the Chief Engineer's confidence in the reliability of the vessel's power generation".  (Daly Dec., ¶ 115).

*Second*, the No. 3 Diesel Generator remained offline (SoF, ¶ 50), which represented a loss of approximately 40% of the vessel's electrical generation capacity (Daly Decl., ¶ 106), and rendered the vessel's bow thruster unavailable (DX-107), impairing its maneuverability in and out of port.  (Daly Decl., ¶ 103)  The choice to leave Aqaba without the bow thruster and with impaired maneuverability "was imprudent and was not in accordance with industry best practice, or good seamanship.  (Foran Decl., ¶ 55).

*Third*, further warnings signs existed in the form of the marked increased in automatic cleaning cycles, which had reached 105 cleaning cycles by May 9, 2018 (Daly Decl., ¶ 117), and the automatic fuel filters remained in a bypassed state.  (Foran Decl., ¶ 16).

*Fourth*, *t*he Vessel left port without sufficient spare parts (*see* Argument, Part III(B), particularly since the failure of the No. 3 Diesel Generator depleted onboard equipment and deprived the vessel of its "ability to conduct any maintenance and repair, planned or emergency[.]" (Daly Decl., ¶ 17).

Indeed, it is clear that the Vessel *should not have left a safe harbor*, and instead should have conducted reliable repairs to all three Diesel Generators, ensured effective treatment of the fuel supply, and taken on a proper complement of spare parts (Daly Decl., ¶ 119; *see also* Foran Decl., ¶ 22, noting the vessel "did not have all available equipment to ensure safe passge"). The decision to leave the port with the availability of all generators was "not in accordance with industry best practice" and was not "reasonably prudent," particularly as the ongoing mechanical issues were clear indicators that the vessel was "unseaworthy." (Foran Decl., ¶¶ 16, 22). It was the choice to leave a safe harbor, without completing repairs and necessary equipment, that "ultimately led to the vessel losing power and drifting" on May 12, 2018. (*Id.* at 18). Liberty Maritime management compounded this error by failing to exercise proper oversight over the vessel, and failing to direct the Vessel's crew to remain in Aqaba until repairs were completed. (Foran Decl., ¶ 30).

The decision to leave safe harbor was particularly notable and imprudent given that the Vessel was transiting through dangerous waters, waters replete with heavy traffic, choke points, and heavy pirate activity, which required increased diligence. (Foran Decl., ¶¶ 19-22, 27-28).

### 4.   The Crew Failed to Report the Initial Loss of Propulsion and Management Failed to Exercise Proper Oversight

Next, the Crew failed to keep Liberty Maritime management apprised of the Vessel's circumstances, and Liberty Maritime failed to properly supervise the Vessel. The loss of propulsion represented a "reportable event" under applicable regulations (Foran Decl., ¶¶ 44-45); however, there is no record that the loss of propulsion was timely reported in the Chief Engineer's Statement of Fact, which states he did not alert Liberty Maritime to the situation until days later on May 9, 2018. (DX-42). Furthermore, Liberty Maritime failed in its duties to investigate the occurrence and the hazardous conditions it created. The International Safety Management Code

applied to the ship's operations, and required such investigation. (Foran Decl., ¶¶ 64-64). However, based on the records produced by Plaintiff, it does not appear that any such investigation took place, or that Liberty Maritime issued any instruction to investigate and conduct necessary repairs. (*Id*. at ¶¶ 65-68).

### 5.    The Vessel's Crew Failed to Switch to Available Alternative Fuel

Additionally, the Vessel's crew further caused Plaintiff's own damages by failing to switch to an alternative fuel. As the foregoing makes clear, it was clear almost immediately after switching to the Beaumont IFO that the ship was experiencing operational difficulties. This should have prompted the crew to explore alternatives, particularly the 1,000 metric tons of IFO fuel loaded April 24, 2018 in Shuaiba, Kuwait. (SoF, Part IV ¶ 26). The crew could have switched to alternative fuel well before the loss of power and propulsion on May 12, 2018. (Foran, Decl., ¶ 40).

### 6.    The Vessel's Management Did Not Timely Repair the Vessel

March 9, 2020 e-mail correspondence between Theodore Makrinos, Vice President of Engineering, to Tom Keenan, Liberty Executive Vice President of Operations, indicates that inspections and corrective action remained "outstanding" stemming from the "contaminated bunkers claim of 2018. (DX-165 at LIBA 006527). This suggests that at least some of the recommendations by MAN in 2018 were still being completed *two years* after the accident. (Daly Decl., ¶ 54). This is particularly relevant given Plaintiff's second tranche of damages concerns alleged damages occurring in *2020*, years *after* the consumption of the Bomin fuel, years after the Vessel was supposedly repaired, and after years of intervening maintenance and operation (potentially improper) by the Vessel's crew.

## C.      Plaintiff Ultimately Caused Its Own Harm

In the final analysis, Plaintiff only has itself to blame for the "dead ship" incident of May 12, 2018, and the resulting damages.  Had the crew undertaken prudent action and Plaintiff's management exercised proper oversight, the foregoing errors would have been rectified, and all issues with the Vessel's fitness would have been resolved, allowing the Vessel to proceed on its intended voyage with the loss of power and propulsion on May 12, 2018, and the resulting damages.  (Foran Decl., ¶ 100).

## CONCLUSION

The law and evidence establishes that (i) the Parties are bound to a written agreement that bars Plaintiff's claims; (ii) the Plaintiff has failed meet their burden of proof; and (iii) Plaintiff caused or failed to mitigate its damages, further barring recovery.  For the reasons herein and the reasons stated in Bomin's Proposed Findings of Fact and Conclusions of Law, Bomin respectfully requests that the Court enter judgment in its favor, and dismiss Plaintiff's Verified Complaint and its claims in its entirety.

Date: September 24, 2021                    Respectfully submitted,

                                            WILSON ELSER MOSKOWITZ EDELMAN
                                            & DICKER LLP

                                            /s/  Frederick W. Reif
                                            Frederick W. Reif
                                            Nathan T. Horst
                                            150 E 42nd Street
                                            New York, NY 10017
                                            (212) 490-3000 – Telephone
                                            (212) 490-3038 – Facsimile
                                            frederick.reif@wilsonelser.com
                                            nathan.horst@wilsonelser.com

                                            Kevin T. Dossett, admitted *pro hac vice*
                                            909 Fannin Street #3300
                                            Houston, TX 77010

31

(713) 353-2000 – Telephone
(713) 785-7780 – Facsimile
kevin.dossett@wilsonelser.com

*Attorneys for Defendant Bomin Bunker Oil Corp.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of September, 2021, a true and correct copy of

the Bomin Bunker Oil Corporation's Pretrial Memorandum of Law has been served upon all counsel

of record via the Court's CM/ECF system to all parties indicated on the electronic filing receipt.

*/s/ Frederick W. Reif*
FREDERICK W. REIF